Barbara A. COLEMAN, and Sandra D. Scott, Plaintiffs,

v.

STATE OF TENNESSEE, et al., Defendants.

No. 96–2166–M1/BRE.

United States District Court, W.D. Tennessee, Western Division.

March 20, 1998.

842

Kaye G. Burson, Rutledge & Rutledge, Memphis, TN, for Plaintiffs.

William J. Marett, Jr., State Attorney General's Office, Civil Litigation and State

Services Div., Mary M. Collier, Office of Attorney General, Civil Litigation and State Services, Nashville, TN, Frank DesLauriers, DesLauriers Law Firm, Covington, TN, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, FOR A NEW TRIAL AND/OR REMITTITUR

McCALLA, District Judge.

This matter is before the Court on State Defendants'[1] Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, a New Trial and/or Remittitur (hereinafter "Defs.' Mot."), filed November 3, 1997. For the reasons set forth below, Defendants' motion is DENIED IN PART AND GRANTED IN PART.

### BACKGROUND

Plaintiffs Barbara A. Coleman and Sandra D. Scott brought separate complaints, alleging that Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII"). Specifically, they both alleged that, while employed by Defendants at the Mark Luttrell Reception Center ("MLRC"), they were subjected to sexual harassment by another MLRC employee, Lieutenant Joe Coulston.[2] The two cases were consolidated on August 14, 1996.

On September 17, 1997, a jury trial in this matter began. The case was submitted to the jury on Plaintiffs' quid pro quo claims and their hostile work environment claims. On September 24, 1997, the jury returned a verdict in favor of Plaintiffs, awarding Plaintiff Coleman compensatory damages of $25,000.00 in "lost wages, sick leave, annual leave or comp time," $5,875.00 for medical and

hospital bills, and $250,000.00 for pain and suffering. The jury awarded Plaintiff Scott compensatory damages of $48,750.00 for "lost wages, sick leave, annual leave or comp time," $1,250.00 for medical and hospital bills, and $700,000.00 for pain and suffering. The Court entered judgment in favor of Plaintiffs, modifying the jury award to Scott pursuant to 42 U.S.C. § 1981a(b)(3).[3]

In their motion, Defendants contend that they are entitled to a judgment notwithstanding the verdict ("JNOV"), pursuant to Rule 50 of the Federal Rules of Civil Procedure. Specifically, they contend that: (1) Plaintiffs should not prevail on their quid pro quo claims because Lt. Coulston did not have "plenary authority" over Plaintiffs so as to invoke respondeat superior liability; (2) there was no job benefit or detriment conditioned upon Plaintiffs' responses to Coulston's advances, as required in quid pro quo cases; and (3) the prompt and effective remedial actions taken by Defendants negate any liability for the hostile work environment sexual harassment created by Lt. Coulston. Defs.' Mot. at 1–2.

Defendants also argue that they are entitled to a new trial because the Court: (1) improperly admitted hearsay testimony; (2) improperly admitted lay opinion testimony, and (3) improperly rejected Defendants' request that the jury verdict form include a list of the specific elements that the Plaintiffs must prove in order to establish their claims. Defs.' Mot. at 2.

Finally, Defendants move for remittitur, alleging that the damage awards to Plaintiffs are not supported by the evidence or warranted by law. They argue that the jury disregarded the evidence before it on the issue of damages for lost wages and leave, that the size of the verdict demonstrates the influence of passion and prejudice over the

---

1. The original Defendants were the State of Tennessee, Tennessee Department of Correction, and Lieutenant Joe Coulston. On September 16, 1997, the Court dismissed with prejudice all claims against Defendant Coulston, with the consent of all the parties. Only the remaining two Defendants bring this motion.

2. At the beginning of the period relevant to this lawsuit, Coulston was working on second shift as

a sergeant. He was promoted to lieutenant in the summer of 1994 and was moved to the third shift.

3. Under this provision, a Title VII Plaintiff suing an employer with more than 500 employees may recover a maximum of $300,000 in nonpecuniary compensatory damages. Accordingly, Scott's damages were reduced to a total of $350,000.

jury, and that the jury was improperly influenced by Plaintiffs' counsel's "speculative argument on damages." Defs.' Mot. at 3.

## I. Motion for JNOV

Defendants moved for summary judgment prior to trial, which the Court denied. At the close of Plaintiffs' evidence, Defendants moved for directed verdict, which the Court denied. (Tr. 419–431). At the close of all the evidence, Defendants moved for judgment as a matter of law, which the Court denied. (Tr. 637). They now renew their motion for JNOV, pursuant to Fed.R.Civ.P. 50(b).

■ A motion for judgment as a matter of law should be granted only if, when all the evidence is viewed in the light most favorable to the nonmoving party, and appropriate inferences made in its favor, reasonable minds could not differ on the issues. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–05 (6th Cir. 1978).

### A. Quid Pro Quo Claims—Agency Liability

■ Defendants argue that, even under the standard set forth in *Morelock*, they are entitled to judgment as to Plaintiffs' quid pro quo claims. In order to prevail under a quid pro quo theory, a Title VII plaintiff must prove:

1) that she was a member of a protected class;

2) that she was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors;

3) that the harassment complained of was based on sex;

4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and

5) the existence of respondeat superior liability.

*Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 186 (6th Cir.1992); *Highlander v. KFC Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir.1986).

Defendants contend, as they have in each of their prior motions for judgment, that there is no evidence that Lt. Coulston had control over the Plaintiffs' hiring, firing, promotions, or discipline. Therefore, according to Defendants, there is no respondeat superior liability in this case, which is required for a quid pro quo claim. Defendants, however, have not properly articulated the entire definition of a supervisor for purposes of respondeat superior liability. *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178 (6th Cir.1992) states:

> Nowhere is it required that an employer must exercise complete control of plenary duties to qualify as an agent of the employer. Rather, all that is required is that the employee have "significant control" of those duties.

*Id.* at 186.

At trial, then, each Plaintiff had to show that Coulston exercised significant control over her hiring, firing, or conditions of employment. *Id.* There was significant testimony as to the control that Coulston exercised over both Plaintiffs.

■ Coleman complained of harassment from approximately November of 1994 until she went out on stress leave in February of 1995.[4] During that period, she worked on the third shift as a Clerical Corrections Officer ("CCO"). From January to April of 1995, Coulston was acting shift commander on the third shift. During this time, he was performing the duties of Captain Judy Grant, who was out on leave. Therefore, he had the same authority and control over Coleman that Captain Grant would have had.

Both Captain Stanley Dickerson and Captain Grant testified that Coulston, as the shift

---

4. The witnesses were not consistent as to dates, so it is not clear from the record when some events occurred. For example, Coleman testified that Coulston began harassing her in November or December of 1994, but also testified that the harassment began *after* Captain Judy Grant went out on leave. (Tr. 78–80). Captain Grant testified that she began her leave in late January of 1995. (Tr. 485).

commander, had the ability to discipline correctional officers through issuing an oral or written warning,[5] as well as grant leave requests for time periods of sixteen hours or less. (Tr. 470, 477–82, 493–95, 538). He was the most senior person present during the shift.

Coleman described him as her supervisor, and testified as to the control he could exert over her conditions of employment. She described that Coulston could file a report if she were tardy, which could affect her employment record, promotions and even her pay. (Tr. 126). She testified that he could move her from one post to another on his shift, and authorize days off. (Tr. 130). He was the person employees on the shift went to in case of a dispute. (Tr. 130). Coleman also testified that he had significant input into her personnel evaluations. (Tr. 131–32). Accordingly, a jury could reasonably conclude that Coulston did exert "significant control" over Coleman's conditions of employment.

■ There are two periods relevant to Scott's employment relationship with Coulston. At both times, Scott held the position of Corrections Officer ("CO"). In the spring of 1994, Coulston was moved to a supervisory position in visitation, where Scott also worked. He remained there until early 1995. It was during this time period that he began harassing her. He would do things such as massage her shoulders, touch her skin, and lean against her, pressing his erect penis into her back. (Tr. 202, 204). He also asked her questions regarding her underwear sizes. (Tr. 214). During this time period, she described him as her supervisor. (Tr. 194). She testified that he could approve days off, and determine duty assignments. (Tr. 194–95).

The second relevant period is only two days: March 24 and 25, 1995. Scott no longer worked regularly with Coulston, because they worked on different shifts. However, when Coulston repeatedly called her to ask her to work a few nights on third shift for him, she finally agreed. On March 24 and 25, 1995, she worked on third shift for Coulston. At this time, Coulston had been promoted to lieutenant and was acting as shift commander for the third shift. It was on these dates that she experienced severe sexual assaults by him. Although it is true that Scott was not normally under Coulston's supervision during March of 1995, this fact alone is not dispositive. The Court gleaned from the testimony at trial that he was the most senior officer in her area on those two nights, and did have control over the conditions of her employment at that time. *See Redman v. Lima City School Dist. Bd. Of Educ.*, 889 F.Supp. 288, 294 (N.D.Ohio 1995) (although plaintiff, a temporary custodian, was only assigned to a school for several days, the principal exerted significant control over the conditions of her employment to render the imposition of agency liability proper).

Particularly when drawing all inferences in Plaintiffs' favor, reasonable minds could certainly differ as to whether Coulston had supervisory control over Plaintiffs. *See Morelock*, 586 F.2d at 1104–05.

### B. *Quid Pro Quo Claims—Job Detriment or Benefit*

■ Defendants also argue that Plaintiffs did not suffer from a job detriment or receive a job benefit conditioned upon submitting to sexual advances, and, therefore, did not establish their quid pro quo claims. As noted above, in order to establish the fourth element of a quid pro quo claim, a plaintiff must show that "the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment ..." *Kauffman*, 970 F.2d at 186; *Highlander*, 805 F.2d at 648.

Defendants contend that the Plaintiffs failed to establish this element. While the Court believes that this is Defendants' strongest argument, the Court cannot, under the standard of Fed.R.Civ.P. 50, find for Defendants as to this issue. Although the evidence regarding this element is scant, it is

**5.** Both Dickerson and Grant stated, though, that in order to give an employee a *written* warning, Coulston would first have to discuss the matter with his supervisor. (Tr. 482, 539).

not so insufficient that reasonable minds could not differ on the issue.[6]

In their response to Defendants' Motion, Plaintiffs concede that they have not suffered a tangible job detriment, with the exception of Coulston once marking Coleman tardy, when she was actually on time. Instead, they argue that they were given, or promised, job benefits. In fact, both Plaintiffs testified that they did receive "favors" from Coulston.

Both Plaintiffs testified that Coulston allowed them to come in late or allowed them to leave without getting in trouble. (Tr. 110–11, 208–09). On more than one occasion, Coulston offered Coleman money for sex. (Tr. 87–88). Scott testified that he would bring her food from home, and that he helped her with her work. (Tr. 202–03). Scott also testified that if she wanted something, or any employees in her unit wanted something, and *she* asked for it, Coulston would give it to her. (Tr. 214–15). Indeed, other employees would come to her and ask her to ask him for favors. (Tr. 215–16).

Defendants seem to believe that the test is whether an employee submitted to sexual advances and then was given a job benefit. A plaintiff is not required, of course, to submit to the unwelcomed advances and then be given a job benefit in order to bring a quid pro quo harassment claim. Nor does the law require an explicit statement such as "If you have sex with me, I'll give you two days leave, or I'll assign you to the best post." The benefit may be implied. *See Kauffman*, 970 F.2d at 186.

The fourth element of a quid pro quo claim requires only that an "employee's submission to the unwelcomed advances [be] an express or implied condition for receiving job benefits." If a supervisor, during the entire period when he is harassing a subordinate, is also bestowing job benefits and offering to do "favors" for her, a jury could reasonably conclude that the employee's submission to his advances is an implied condition for receiving job benefits. A reasonable juror

could conclude that Coulston was using the favors and benefits as inducements to get Plaintiffs to succumb to his advances.

For the above reasons, the Court DENIES Defendants' motion for JNOV insofar as it relates to Plaintiffs' quid pro quo claims.

### B. Hostile Work Environment Claims—Defendants' Remedial Action

As to Plaintiffs' hostile work environment claims, Defendants argue that their prompt remedial action was effective, and insulates them from liability. In order to prevail on her claim against Defendants, each Plaintiff must show that:

(1) she is a member of a protected class;

(2) she was subject to unwelcomed sexual harassment;

(3) the harassment was based on her sex;

(4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and

(5) [Defendant] "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."

*Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir.1997)(citing *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 50 (6th Cir. 1996) and *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618–19 (6th Cir.1986)).

Defendants assert that they took prompt and effective remedial action once they learned of the harassment by Lt. Coulston. Therefore, Plaintiffs cannot establish the fifth element of their case. There is substantial evidence to the contrary, however.

It is true that management began an investigation into the harassment by Lt. Coulston on April 5, 1995, and that he was terminated in June of 1995. However, April 5, 1995 is not the date that Plaintiffs first made their complaints to management, according to Plaintiffs. A defendant is on no-

---

6. As a practical matter, the damages award against Defendants will stand if the Court upholds the jury verdict on *either* the hostile work environment claims *or* the quid pro quo claims.

For both Plaintiffs, the jury found that the same amount of damages should be awarded under *either* claim. *See* Verdict Forms.

tice of sexual harassment when it has actual or constructive knowledge of the harassment. *Blankenship*, 123 F.3d at 872.

There was testimony, undisputed by Defendants, that Corporal Sharon Cason and Sergeant Betty Hammond were informed about the harassment as it was occurring. Defendants deny that Cason and Hammond are higher level management employees, and cite to *Fawns v. Ratcliff* for the proposition that "higher management" employees must know of the harassment in order to constitute notice to Defendants. 117 F.3d 1420, 1997 WL 377025 (6th Cir. July 3, 1997)(unpublished opinion). *Fawns*, however, is distinguishable from this case. The plaintiff in *Fawns* had told the defendant's personnel coordinator on three occasions about the harassment she was experiencing. *Fawns*, 117 F.3d at 1420. The *Fawns* plaintiff submitted no evidence, however, that the personnel coordinator had management-type responsibilities or authority. *Id.* Instead, there was testimony that she was "never a member of management, served merely as a clerk, and handled only payroll, insurance and worker's compensation matters." *Id.* Because there was no contrary evidence, the Court held that notice to the personnel coordinator did not constitute notice to the company. *Id.* Nowhere in *Fawns* does the Court state that "management" must be "higher level management."

In this case, Coleman testified that Corporal Cason was her supervisor. (Tr. 101–02). Cason testified that she was responsible for Coleman's performance evaluations. (Tr. 522–23). If Corporal Cason gave an order, Coleman was required to obey it (Tr. 103). Likewise, Scott testified that Sergeant Hammond was a higher-ranking official, although not her immediate supervisor. (Tr. 193). The Court need not resolve the issue of whether Cason and Hammond were sufficiently high in the management chain to constitute notice to Defendants, however, because there is substantial evidence in the record to support a jury finding that Defendants had notice of harassment by Coulston as early as 1994. Accordingly, their investigation in April of 1995 would not have been prompt.

Captain Dickerson and Captain Grant are clearly management employees. *See* Mem. Supp. Defs.' Mot. at 11 (notice to Lieutenant Byrd sufficed to constitute notice to Defendants, and Captains Grant and Dickerson are same, if not higher, level of management as Byrd).

Scott testified that she went to Captain Dickerson in the spring of 1994 and said, "Lieutenant Coulston is crazy ... *He's touching and feeling of me going crazy* ... Will you help me? ... Come around here and check on me every now and then.... keep coming around here, you know, let me hear you." (Tr. 205–06) (emphasis added).

Although Coleman was not as explicit, she, too, testified that she told Dickerson that Coulston needed "to leave [her] alone ... because he's getting overboard with the things he's done or is doing." (Tr. 199). This, apparently, was in February of 1995, just before she left on sick leave. (Tr. 199). In addition, another female employee, Barbara Hefley, testified that she spoke to Captain Grant prior to Captain Grant going out on sick leave near the end of 1994. Ms. Hefley testified that she told Captain Grant that Coulston would linger around her, that he touched her, and that he made her feel very uncomfortable. (Tr. 375–76); *see also* Tr. 400–02 (although the time-frame is not entirely clear from the record, testimony of Selma Denise Jennings that she complained to Captain Dickerson prior to March of 1995 about Coulston rubbing her leg).

While Captain Grant and Captain Dickerson denied having heard such complaints, the jury clearly believed Plaintiffs and their witnesses. Again, drawing all inferences in Plaintiffs' favor, the jury could reasonably have found that Defendants had notice of Coulston's harassment in 1994. Accordingly, any remedial action taken would not have been prompt.

For the above reasons, Defendants' motion for JNOV at to Plaintiffs' hostile work environment claims is DENIED.

## II. *Motion for New Trial*

Under Rule 59, "[a] new trial may be granted to all or any of the parties and on all

or part of the issues." Fed.R.Civ.P. 59(a). In *Holloway v. Wal–Mart Stores, Inc.,* 909 F.Supp. 534 (E.D.Tenn.1995), the court summarized the standard for considering a motion for new trial:

> Under Fed.R.Civ.P. 59, the question of granting or denying ... a motion for a new trial following a jury verdict addresses ... the judicial discretion of the trial judge and is subject to review under the abuse of discretion standard. [W]hile the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached. Thus, the Court's responsibility is to prevent an injustice ....

*Id.* at 536 (internal citations and quotations omitted).

Moreover,

> [w]hen determining whether to grant a new trial under this standard, courts must compare the opposing proofs, weigh the evidence, and set aside the verdict only if it [sic] determines that the jury's verdict was contrary to the clear weight of the evidence. A court may not substitute its judgment for that of the jury, but should only act when it is convinced the jury's decision was unreasonable. If the result is *reasonable,* the [c]ourt should accept the verdict.

*Id.* at 536 (emphasis in original) (internal citations and quotations omitted). Defendants contend that the jury's verdict as to the issues discussed in Section I of this Order is unreasonable and against the clear weight of the evidence. For the reasons set forth in Section I, the Court finds that the jury's verdict for Plaintiffs on their quid pro quo and hostile work environment claims was reasonable and was consistent with the evidence.

Defendant also argues that the Court erred in admitting certain testimony, and in failing to include the different elements of each claim in the verdict form itself. Each of these alleged errors is addressed below.

## A. *Hearsay Objections*

At trial, Defendants objected to testimony by Plaintiffs, witnesses Sheila Gunn, Mary Wallace, Selma Jennings, Larry Salter, and Myra Williams as to what other employees said. Defendants now contend that the Court erred in admitting the statements.

The Court notes that Defendant does not make specific references to the testimony, so the Court cannot properly address each portion of testimony that Defendants claim was improperly-admitted hearsay. Generalized, non-specific objections, without more, do not provide a basis for awarding Defendants relief. However, the Court does note that many of the statements offered over Defendants' objections were offered *not* to show the truth of the statements,[7] but to show notice to supervisors. *See, e.g.,* Tr. 105.

## B. *Lay Opinion Testimony*

Defendants also argue that the Court improperly allowed Plaintiffs, and witnesses Gunn, Wallace, Jennings, Salter, and Williams to testify as to the "atmosphere at the Mark Luttrell Center" regarding sexual harassment. According to Defendants, this testimony was "vague and conclusory and does not fall within the parameters of admissible testimony under Rule 701 because it does not relate to a matter capable of perception, nor does it assist the jury by providing clarity as to a 'factual' matter." Mem. Supp. Defs.' Mot. at 15.

Rule 701 of the Federal Rules of Evidence allows a lay witness to testify as to "opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

Again, Defendants do not make specific references to the record. However, the Court has reviewed the testimony from the witnesses as to the environment or attitude toward sexual harassment at MLRC. The Court concludes that the opinions of the wit-

---

7. Hearsay is defined "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

nesses meet the requirements of Fed.R.Evid. 701 and were properly admitted.

### C.   *Verdict Forms*

█ Defendants object to the Court's decision not to include the individual elements of Plaintiffs' quid pro quo and hostile work environment claims on the verdict forms. During the discussion regarding the verdict form, the Court made clear that it was not only unnecessary to include the individual elements on the verdict forms, but it would likely have been confusing for the jury.[8] *See* Tr. 594–95. The Court instructed the jury as to the specific elements of each claim, and the jurors received the information as to the individual elements in the written instructions they were provided. Nothing more was necessary.

### III.   *Motion for Remittitur*

█ Defendants contend that the compensatory awards in this case are excessive. A jury award will be reduced as excessive only if "it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Jackson v. City of Cookeville,* 31 F.3d 1354, 1359 (6th Cir.1994)(quoting *Farber v. Massillon Board of Education,* 917 F.2d 1391, 1395 (6th Cir. 1990)). The award must be "so excessive . . . as to shock the judicial conscience of the court." *Id.*

### A.   *Awards for pecuniary losses*

The jury awarded pecuniary damages to both Plaintiffs, divided into two categories: 1) leave and lost wages; and 2) medical and hospital expenses.

### 1.   *Lost wages and leave*

█ Defendants argue that the damages as to leave are unsupported by the evidence,

and that they reveal a lack of understanding by the jury as to the sick leave policies at MLRC. They have attached a copy of the sick leave policy, as well as the affidavit of Gary Godsey from the Tennessee Department of Personnel.[9] The Court notes, as it did at trial, that either party could have placed this information into evidence at trial, but both failed to do so. (Tr. 633).

█ The Court cannot use evidence the jury did not have before it to alter a damage award, absent some compelling reason or justification. *See* Fed.R.Civ.P. 59 (allowing a motion for new trial to be granted for reasons such motions previously granted "in actions at law in the courts of the United States") *and* Fed.R.Civ.P. 60 (suggesting grounds for setting aside judgment, including "newly discovered evidence *which by due diligence could not have been discovered* in time to move for a new trial under Rule 59(b)")(emphasis added). Therefore, the Court will not consider the submitted evidence.

The Court agrees with Defendants that the jury may not have completely understood the sick leave policy, or the fact that employees do not actually get paid for unused sick leave. However, the fact that the evidence in the record may have confused the jury as to the sick leave policy does not warrant setting aside the verdict. Defendant should have made the policy clear at trial.

█ Even though Defendant failed to place this information into evidence, however, the damage awards must be remitted. Damage awards must be reasonably based on or derived from the evidence in the record. *Jackson,* 31 F.3d at 1359. There was simply no testimony to contradict Janet Riddle's [10] testimony regarding the amounts owed to Plaintiffs as a result of lost wages, sick leave, annual leave, and comp time.[11] Ms. Riddle's

---

8. The jury was already required to fill out two verdict forms, one for each of the Plaintiffs. Each form required a determination of liability as to two separate claims and three elements of damages on each claim, if any. Additional information would have made the forms confusing, and would not have added clarity.

9. Mr. Godsey's job title is "Personnel Program Director II."

10. Ms. Riddle works at MLRC as a personnel technician.

11. There were two exhibits introduced into evidence during Ms. Riddle's testimony, Exhibits 12 and 13, which supplement and explain her calculations.

calculations were that Coleman lost $7,717.37 and Scott lost $7,624.80. (Tr. 339, 342–43). Indeed, Plaintiffs' counsel argued for these amounts in her closing. (Tr. 665). Instead, the jury awarded Coleman $25,000.00 and Scott $48,750.00. These awards are not supported by the evidence, and cannot stand.

Accordingly, the Court hereby reduces the awards to Plaintiffs for lost wages and leave to $7,717.37 for Coleman and $7,624.80 for Scott.

### 2. Medical Expenses

■ Likewise, the only testimony regarding the cost of medical and hospital expenses by Plaintiffs was uncontradicted. There was evidence that Coleman's medical bills totaled $5,095.00. Scott testified that she attended 12 to 15 therapy sessions. (Tr. 252). Although it is not clear from the testimony which of these she paid a $40 co-payment, assuming she paid it for all fifteen sessions, then her damages would be $600.00. (See Tr. 252). Again, Plaintiffs' counsel argued for these amounts, or for less, in closing.[12] The jury awarded Plaintiffs Coleman and Scott $5,875.00 and $1,250.00 respectively. The Court, accordingly, reduces these amounts to $5,095.00 for Coleman and $600.00 for Scott.[13]

### B. Nonpecuniary compensatory damages

■ Defendants argue that the nonpecuniary damages awards were excessive as well. The Court disagrees.

Coleman endured Lt. Coulston's repeated harassment over a period of several months. The incidents alleged by Coleman included repeated requests for sex, offers to pay for sex, and inappropriate sexual questions. (Tr. 88). Coleman also testified that Coulston exposed himself to her (Tr. 120). In addition, there was an incident where Coulston took her to the roof and put his hand around her waist, pulling her close to him. (Tr. 90). Another time, he came up behind her while she was on her way to the copy room and grabbed her, putting both of his hands on her breasts. He then asked her "Do you like that?", to which she responded "No.". (Tr. 104). He also grabbed her once between her legs. (Tr. 98).

Coleman sought help from two programs on an outpatient basis, Charter Lakeside and the Genesis Program. She also went to see Dr. Nora Reyes, because she was "really, really upset, tired ... and crying." (Tr. 135). She testified that she had nightmares, problems sleeping, and that her eating habits were affected. (Tr. 135). She described her feelings: "I was very angry, very angry. I felt ... used, I felt like a laughing stock, I felt like didn't nobody care ... I just felt bad, I felt sad, I felt hurt. I felt sorry for myself. I felt ... dirty, stupid, I don't know, just felt bad." (Tr. 136). Dr. Reyes testified that Coleman needed further treatment. See Deposition of Nora Reyes at 36–39, read into evidence at trial (Tr. 396–97). Plaintiff spent over $5,000.00 seeking treatment. Further, Ms. Myra Williams, a close friend and roommate of Ms. Coleman's, testified as to the psychological impact the harassment had on her. (Tr. 170–71).

The evidence in this case showed that Scott experienced severe incidents of physical harassment by Lt. Coulston.[14] She testified as to the mental anguish and pain she

---

12. Plaintiffs' counsel actually argued for $490 for Scott, a miscalculation which counsel apparently derived from 12 sessions at $40 per session.

13. The Court recognizes that neither party has raised or addressed this specific element of damages. Defendants have objected to the entire jury verdict, however, so it is proper to address the motion for remittitur as to this element of damages.

14. According to Scott's testimony, on March 24, 1995, Coulston sat on her desk for four hours, talking to her, asking her personal questions, and holding her hand. (Tr. 222). He asked her several times to go to the catwalk (a supply hall and area with windows overlooking the unit), and when she did go out there with him, he felt her breasts inside her blouse. (Tr. 223–24). She testified that she could not explain why she didn't do anything in response or try to fight back, but she was able to leave after about five or ten minutes. (Tr. 224). She went to work as scheduled the second night, and endured a more severe incident of sexual assault on the catwalk, including vaginal penetration by Coulston's finger. (Tr. 231–232) (testimony describing sexual assault by Coulston).

suffered as a result of Coulston's actions. She described continuing effects on her sleep patterns, on her social interactions, on her parenting skills, and on her ability to care for her children. In addition, Ms. Ann Finch, a psychotherapist, testified as to Scott's condition, and stated that it was her opinion that Scott is in need of further treatment. (Tr. 276, 291).

The Court heard the testimony of these witnesses and had the opportunity to observe their demeanor. The Court found the Plaintiffs to be credible, not only in their descriptions of the events that took place, but also in their reactions to those events. Obviously, discerning a monetary amount that would compensate Plaintiffs for the emotional pain and suffering they suffered as a result of Coulston's actions is not a precise science. However, the jury's award seems reasonable in light of the severity of the harassment and the severity of the damages.

 Defendants also argue that Coleman's damages award should be reduced, because she did not suffer the "most egregious" harassment. Mem. Supp. Defs.' Mot. at 20. Although it is true that the jury awarded nearly three times as much to Scott as they did to Coleman, it does not necessarily follow that the Court should reduce Coleman's award to one-third of Scott's reduced award.[15] The jury independently determined that Coleman suffered $250,000.00 in damages. An award of this amount to Coleman, to compensate her for the damages caused by Coulston's conduct, does not "shock the conscience" of this Court.

Even if the statutory cap should be reserved for "egregious cases," as Defendants argue, the amount of $250,000 ($50,000 below the cap amount) is not excessive in this case. *See, e.g., Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir.1992) (upholding $350,000 in damages for mental anguish in age discrimination case). Moreover, relative to many cases of sexual harassment, Coleman's case might easily be labeled "egregious."

Finally, Defendants urge the Court to order remittitur or to provide a new trial based on Plaintiffs' counsel's "speculative argument" on damages.[16] There was a brief discussion, prior to closing arguments, regarding whether Plaintiffs' counsel could argue for damages in excess of the statutory cap. The Court made clear that the jury should not be told about the cap, and also that Plaintiffs' counsel was to base her request for damages on the evidence in the record. As noted above, it is necessarily difficult to place a dollar amount on the pain and suffering endured by Plaintiffs. "The determination of the extent of permissible comment and argument by counsel resides primarily in the sound discretion of the trial judge." *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir.1997). The Court determines that the argument by counsel here was reasonably based on the evidence.

The amounts awarded to Plaintiffs do not "shock the conscience" of the Court. The Court thus rejects Defendants' argument that the nonpecuniary damage awards are excessive.

### CONCLUSION

For the reasons set forth above, Defendants' Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, a New Trial and/or Remittitur is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to remittitur of pecuniary damages. It is DENIED in all other respects. An amended judgment will be entered in accordance with this Order.

---

**15.** As discussed above, Scott was awarded $700,000.00 for pain and suffering, and Coleman was awarded $250,000.00. Scott's damages for pain and suffering were reduced to the applicable statutory cap of $300,000.00.

**16.** Counsel requested nonpecuniary damage awards of $750,000.000 for Coleman and $1.5 million for Scott. (Tr. 667–68).