**Karen S. PETTY, Plaintiff,**

v.

**DHL AIRWAYS, INC., Defendant.**

**No. C–1–00–286.**

United States District Court,
S.D. Ohio,
Western Division.

Oct. 5, 2001.

Barbara D Bonar, Squire N Williams, III, Wolnitzek Rowekamp & Bonar – 1,

Covington, KY, for Karen S Petty, plaintiff.

Linda L Woeber, Montgomery, Rennie & Johnson – 1, Cincinnati, OH, Kimberly Vanover Riley, Montgomery Rennie & Jonson, Cincinnati, OH, for DHL Airways Inc, dba, DHL Worldwide Express, defendant.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 14), Plaintiff's Response to Defendant's Motion for Summary Judgment (doc. 17) and Defendant's Reply (doc. 21).

On April 7, 2000, Plaintiff filed a Complaint alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (doc. 1). On June 1, 2001, Defendant, DHL Airways, Inc., filed a Motion for Summary Judgment (doc. 14). On June 25, 2001, Plaintiff filed a Response to Defendant's Motion for Summary Judgment (doc. 17). On July 10, 2001, Defendant filed a Reply Memorandum in Support of Defendant's Motion for Summary Judgment (doc. 21).

### Background

The following facts are extracted from the Parties' various motions (docs.14, 17, 21). Plaintiff, Karen Petty, had worked as a courier for DHL for five years when her supervisor, Dave Pemberton, was replaced by Peter Littler (docs.14, 17). Defendant asserts that Pemberton was a personal friend of Plaintiff and she was disappointed that he would no longer supervise her (doc. 17). In October of 1997, after four years of employment, Defendant promoted Plaintiff to the position of dispatcher. (*Id.*). As a dispatcher, Plaintiff spent most of her workday in a small office (doc. 17). The Parties agree that it was at this time that a conflict arose between Plaintiff and Littler (docs.14, 17).

Plaintiff asserts that almost immediately after she began her dispatcher job, she noticed that Littler was spending an inordinate amount of time in her office with no legitimate reason for doing so (doc. 17). Plaintiff further asserts that Littler "intimidated her" and made comments about "personal things" (*Id.*). Plaintiff argues that the close proximity between herself and Littler facilitated Littler's acts of sexual harassment toward Plaintiff (*Id.*). According to Plaintiff this harassment consisted of offensive comments, "hovering," and constantly standing so close to Plaintiff that he could and did press the front of his pants against Plaintiff's shoulder (*Id.*).

Plaintiff contends that the Littler's harassment was continuous and that she endured offensive comments, touching and continual "hovering" in extremely close proximity to Plaintiff on a daily basis (*Id.*). Plaintiff asserts that Littler would occasionally intentionally cause physical contact with her and that on one such occasion, while she was bending down to get files out of a bottom drawer, Littler stepped forward and "thrust his penis into the side of [her] face" (*Id.*).

According to Plaintiff Littler continued his harassment by making personal comments to her about such things like the way she smelled, her fingernails, her tattoos and where they were located and the sexual orientation of one of her friends (*Id.*).

After approximately three months, Plaintiff informed Pemberton about Littler's harassing act (docs.14, 17). Pemberton was another DHL manager and both Parties agree he was a personal friend of Plaintiff (*Id.*). Pemberton was stationed in Dayton, Ohio and was a Service Center Supervisor for DHL (*Id.*). Plaintiff asserts that she felt more comfortable in disclosing the harassment to Pemberton than to John Corrigan, the supervisor, at

the station where she worked (doc. 17). Plaintiff contends that during the period of time in which Plaintiff was pursuing a complaint, Corrigan spent a great deal of time away from the Cincinnati office (*Id.*). Despite this difficulty, Corrigan met with Plaintiff the next day (docs.14, 17). At this meeting, Plaintiff presented Corrigan with a list of issues regarding her work relationship with Littler (docs.14, 17).

Corrigan had hired Littler into the position of A.M. Supervisor at the Service Center (doc. 14). Plaintiff asserts that Corrigan, relying on the "previous history" he had with Littler, failed to "screen" him before promoting him into the supervisory position at the Service Center (*Id.*). Plaintiff contends that previous to Corrigan's decision to promote Littler, various personnel at Defendant's hub were already aware that Littler had a history of sexual harassment (*Id.*). For instance, when Peggy Schultz, the current P.M. Supervisor at DHL, was asked in deposition if she believed Littler had a reputation for sexually harassing women at DHL, she answered "yes" (*Id.*). According to Plaintiff, Schultz also testified that there were a lot of stories about Littler's propensity for sexual harassment and an infatuation with women's chests (*Id.*).

Defendant contends that Schultz's testimony amounts to "rumors" and "folklore" and that Schultz has only been employed by Defendant since October 2000 (doc. 21). Defendant further contends that Schultz's impressions of Littler were mostly created by conversations with Pemberton (*Id.*).

According to Plaintiff, Pemberton was also aware of Littler's reputation for sexual harassment (doc. 17). Plaintiff asserts that Pemberton testified that he had been told by a supervisor at the hub that Littler had been transferred around the hub to different departments and that women who complained about him were no longer with the company (*Id.*). Defendant de-scribes these allegations as unsubstantiated rumors (doc. 21).

Plaintiff maintains that Corrigan failed to investigate Littler's personnel history before promoting him to a position managing Plaintiff and only reviewed Littler's personnel file after Plaintiff's complaints about him (doc. 17). Plaintiff further maintains that Littler had been previously reprimanded for female harassment and that he had been issued more than one "final" warning for sexual harassment (*Id.*).

The alleged previous incidents included comments to Sherry Bruce, a female employee, whom Littler called a lesbian and "homewrecker" and to whom he stated that he did not want to hire single mothers (*Id.*). They also included various incidents arising between Littler and Sharon Shenberg, a pregnant employee (*Id.*). For instance, Littler assigned Ms. Shenberg a van which was difficult for her to enter and exit; Littler also allegedly called Ms. Shenberg "fat" (*Id.*). Plaintiff asserts that Littler required Ms. Shenberg to pick up a box three times and critiqued her at a training class in front of other members of the class, finally commenting, "OK you have an excuse, there's something in the way" (*Id.*). Finally, Bobbie Berkfeld, a female Courier Guard, allegedly also complained of Littler's comments regarding single moms and stated that Plaintiff had confided with her about Littler's skulking (*Id.*).

DHL management conducted a meeting with Littler to discuss these allegations (docs.14, 17). Plaintiff avers that when Littler was confronted with these allegations, he admitted many of them and the allegations he denied were those to which there were no witnesses (doc. 17). Plaintiff asserts that Littler, when confronted with her complaints about his groin in her face, characterized her as "fantasizing"

about Littler sexually harassing her (*Id.*). Defendant counters that Littler was merely stating that Plaintiff made up the incident (doc. 21).

Defendant admits that Littler did acknowledge making comments about Ms. Bruce's sexual orientation, Ms. Shenberg's pregnancy and Ms. Petty's personal phone calls to her husband, the length of her nails and her tattoo (doc. 14). However, Defendant asserts that Littler denied any physical contact with Plaintiff and believes that she may have been targeting him so that she could do her duties without any supervision (*Id.*).

According to Defendant, Corrigan and Dennis Arends, a Human Resources Generalist, met with Al Schmuttenmaer and discussed options for responding to Plaintiff's complaints (*Id.*). Defendant contends that Plaintiff had no corroboration for her accusations of physical contact and that only one comment was substantiated by a co-worker (*Id.*). Defendant further contends that Corrigan and Arends reviewed Littler's file and that, during that review, Corrigan and Arends noted a final written warning Littler received in January 1990. This final warning resulted from an investigation conducted in response to a series of complaints from the group he supervised in the letter sort area at DHL's airport hub and contained a reference to inappropriate sexual comments; the last time such incidents took place was September, 1989 (*Id.*).

Defendant asserts that in response to that possible sexual harassment, that it assigned Littler to a disciplinary period of ninety days and required him to attend a seminar entitled "How to Supervise in the 1990's" (*Id.*). Defendant further asserts that Littler's annual appraisals from the years following his warning showed regular monitoring by his managers (*Id.*).

According to Defendant, Corrigan, Arends and Schmuttenmaer took note of the length of time between the original sexual harassment complaints and Plaintiff's sexual harassment complaint (*Id.*). In addition, they took note of what they believed to be Littler's management skills and improvement in his working relationships (*Id.*). Consequently, Defendant Corrigan decided to issue a final written warning for the duration of his employment rather than terminating his employment (*Id.*).

Defendant asserts that the final written warning specifically referred to the criticisms which Corrigan and Arends were able to substantiate and included a list of thirteen directives for Littler to follow to avoid further perceptions of creating a hostile work environment (*Id.*). Defendant also asserts that Littler was also told to refrain from comments, statements, questions and discussions that were not specifically job-related (*Id.*). On the same day, Corrigan met with Plaintiff to communicate the actions taken against Littler and the plan to monitor future behavior and prevent retaliation (*Id.*).

Plaintiff emphasizes that Littler admitted "many" of the allegations against him and that Littler had a history of sexual harassment (doc. 17). Plaintiff asserts that Defendant's response to her concerns about Littler was that they were only the result of a communication problem (*Id.*). Plaintiff likewise asserts that Defendant, instead of reprimanding Littler, decided to "protect" him and that Corrigan "stood by his decision" to hire Littler (*Id.*).

Plaintiff maintains that she cooperated with management and followed up on the progress of the investigation (doc. 17). Plaintiff asserts, however, that she was not taken seriously and that Arends told her that "her complaints did not need to go any further" than Plaintiff's region (*Id.*). According to Plaintiff, in an effort to be taken more seriously, she wrote to the

Human Resources Department at DHL headquarters in San Francisco (*Id.*).

Plaintiff asserts that during most of 1998, Littler was allowed by Defendant to continue to supervise her despite her complaints (*Id.*). Plaintiff claims that during this time, Littler began to retaliate against her for making her complaints (*Id.*). According to Plaintiff, Littler stopped talking to her and communicated to her only through written notes (*Id.*). Plaintiff also claims that Littler successfully encouraged the male courier to do the same (*Id.*).

Plaintiff contends that Littler excluded her from many of the dispatch office's daily operating activities and changed the details of her job without her knowledge (*Id.*). According to Plaintiff, these changes made it very difficult for her to do her job (*Id.*). When she brought these further complaints to Corrigan, according to Plaintiff, he did nothing to end the retaliatory acts and saw this new situation as nothing more than a failure to communicate (*Id.*). Corrigan stated he never considered that these actions might be retaliatory (*Id.*).

Defendant contends that Corrigan did make an effort to address Plaintiff's concerns and met more than once with Littler, and Cizek (the male courier) (doc. 17). Defendant claims that Plaintiff admits communication among these three employees improved after these meetings (*Id.*). According to Defendant, Corrigan acknowledged Plaintiff's other complaints about the operational changes at the service center (*Id.*). Defendant claims, however, that these were merely day-to-day decisions with which Plaintiff disagreed (*Id.*).

One of Plaintiff's chief concerns after bringing complaints of harassment against Littler was that he would still be charged with conducting her next performance evaluation (doc. 17). Plaintiff contends that, over the course of several months,

she continued to request that Littler not conduct her performance evaluation (*Id.*). However, according to Plaintiff, Defendant, and especially Corrigan, insisted that Littler evaluate her performance (*Id.*).

Plaintiff asserts that it was Defendant's insistence that Littler conduct her evaluation along with the fact that Littler was still supervising her and retaliating against her on a daily basis which made her job unbearable and resulted in Plaintiff's taking of a medical leave of absence (*Id.*). Plaintiff concludes from this that, but for Littler's harassment and retaliatory acts, she would still be working for DHL (*Id.*).

Defendant asserts that Plaintiff actually took two leaves of absence (doc. 17). According to Defendant, Plaintiff requested the first one because she was having elective fertility surgery (*Id.*). Defendant contends that during a conversation Plaintiff had with Schmuttenmaer she complained that Littler should not be her supervisor anymore, but that there had been no further inappropriate or harassing incidents or comments since her original complaint in January (*Id.*).

According to Defendant, Petty returned to work on July 20, 1998 for approximately one month before she took a second leave of absence (*Id.*). Defendant contends that Corrigan assured Plaintiff in writing that he would review her evaluation before she received it, attend her evaluation meeting with Littler and discuss any concerns, outside Littler's presence, that she may have had following her evaluation (*Id.*). Defendant asserts that Plaintiff's second leave of absence was due to a stomach disorder and stress (*Id.*). Defendant contends that Plaintiff, who was receiving counseling told her therapist on October 21, 1998, just before her resignation, that she was doing very well (*Id.*).

According to Plaintiff, after she left, DHL continued to receive sexual harass-

ment complaints about Littler (*Id.*). Specifically, Tina Petty, a P.M. dispatcher, (no relation to Plaintiff) complained to Schultz, her supervisor, that Littler "kissed and hugged her" (*Id.*). Plaintiff contends that Schultz was "appalled" by Littler's history of harassment and confronted Arends about why Littler was allowed to remain employed with DHL in spite of that history (*Id.*). Defendant claims that this complaint was lodged over two years after Plaintiff resigned and had never gone beyond the accusation stage (doc. 21).

## ANALYSIS

### I. STANDARD OF REVIEW

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for

trial." Fed.R.Civ.P. 56(e); *see Guarino*, 980 F.2d at 405.

As the Supreme Court stated in *Celotex*, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Guarino*, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino*, 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. *Guarino*, 980 F.2d at 410; *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991).

### II. HOSTILE WORK ENVIRONMENT

■ The Sixth Circuit, in *Burnett v. Tyco*, 203 F.3d 980 (2000), set out guidelines for determining whether a work environment should be considered hostile or abusive. According to *Burnett*, courts should consider several factors when evaluating the hostility of a particular work environment. *Id.* at 982–983. Among these factors are "the frequency of the

discriminatory conduct, its severity, whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance." *Id. citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Put another way, courts are to use the above factors to determine if the conduct is "sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and thereby creates a hostile or abusive working environment." *Id.* at 985. However, the court also took note of Supreme Court precedent in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) which cautioned that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment with the meaning of Title VII."

The plaintiff in *Burnett* complained that the personnel manager placed a pack of cigarettes inside Burnett's tank top and brassiere strap while telling a story about a woman he had recently seen. *Burnett*, 203 F.3d at 981. Burnett acknowledged that, even though she was "stunned, shocked and exposed," the resulting exposure was no greater than it would have been if she had leaned over while wearing the top. *Id.* At a later date, Burnett was coughing and the same personnel manager gave her a cough drop, saying "Since you lost your cherry, here's one to replace the one you lost." *Id.* In the last significant incident, Burnett was wearing a Christmas sweater that read "Deck the Malls;" this personnel manager, seeing the sweater, stated "dick the malls, dick the malls, I almost got aroused." *Id.*

The Sixth Circuit, applying these standards outlined above to the facts asserted by Burnett, and considering an evaluation of the totality of the circumstances mandated by *Williams v. General Motors Corporation*, 187 F.3d 553 (6th Cir.1999), decided that the conduct Burnett complained of did not create work environment sufficiently hostile to constitute discrimination. *Id.* at 984–985.

The *Burnett* court distinguished these facts from those in *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246 (6th Cir.1998) where the Sixth Circuit reversed the grant of a summary judgment in favor of the defendant/employer. In *Abeita*, the plaintiff alleged discriminatory conduct in the form of several offensive comments made over the course of seven years. Only one of those comments, however, was specifically directed at the plaintiff. That comment, made by the president of the company was, "yellow dress and yellow shoes, yellow underwear too?" In addition to this incident, the president made comments about his sexual interest in other women, including interest in a model who the president hired for a photo shoot as a way to meet her. The Sixth Circuit reversed the district court based on its failure to take into account the plaintiff's claim that the president's sexual comments were "commonplace," "ongoing" and "continuing." *Burnett*, 203 F.3d at 983–984 *citing Abeita*, 159 F.3d at 248–252.

In a recent case, *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir.2000), the Sixth Circuit considered the sexual harassment claims of a plaintiff who was unable to demonstrate a hostile work environment. In such a case, the court held that a plaintiff attempting to establish that non-sexual conduct violated Title VII would have to show that but for the employee's sex, he would not have been exposed. *Id.* at 463. In *Bowman*, the Sixth Circuit agreed with the district court that an incident of a female supervisor rubbing the shoulders of her male subordinate was sufficiently ambiguous to destroy any probative value in regard to the question of a hostile work environment. *Id.* at 463.

Defendant, urges the Court to construe Littler's comments in regard to Plaintiff's tattoo and his question as whether she had anymore, his regular close proximity to her chair and his placement of his groin near her ear as not possibly sufficiently "imbued with sexual flavor" to establish sexual harassment (doc. 14; *Id.*). Defendant further argues that this conduct is similar to the shoulder-rubbing incident in *Bowman* and therefore are too ambiguous to be of any probative value (*Id.*). Therefore, Defendant urges that this conduct should be ignored by the Court in its analysis of Plaintiff's work environment (*Id.*).

Further, Defendant reasons that the totality of the circumstances test mandated by *Williams,* 187 F.3d 553 requires the Court to consider, among other things, that Littler promoted Petty to dispatcher; he issued Drive–to–Deliver awards to Petty on several occasions, both before and after she filed her internal complaint and Petty's work group included a balanced number of men and women (*Id.*).

Defendant thus urges the Court to further discount Plaintiff's complaints about Defendant's failure to supply her with a uniform shirt when it provided men with shirts, her complaints about Littler's stated refusal to hire single mothers, Plaintiff's complaints that males had been allowed to take off for hangovers while women were not allowed to take time off to care for their kids and Plaintiff's perception that male couriers had been given more time to train than female carriers (*Id.*).

Thus, according to Defendant, the Court should only consider, in its evaluation of Plaintiff's workplace, her complaints of Littler's hovering (doc. 14). Defendant asserts that Plaintiff worked in a very small office and that the only way for Littler to train and supervise her was to physically watch and listen to her communications

with couriers (*Id.*). Defendant further asserts that Plaintiff admitted that she enjoyed her position as dispatcher, and felt she was very good at it (*Id.*). Defendant concludes from this that Plaintiff's uneasiness with Littler's physical proximity was not sufficient to create an intolerable work environment that amounts to a discriminatory change in the terms and conditions of her employment (*Id.*).

Plaintiff argues that under *Burnett,* sexually harassing behavior must be severe or pervasive and that *Burnett* found in favor of the defendant because the plaintiff could not show that the conduct complained of was commonplace, ongoing or continuing (doc. 17). Plaintiff asserts that, in her case, the hovering she complained of was indeed commonplace, ongoing and continuing (*Id.*). In support of this assertion, Plaintiff points to her initial complaint where she listed twenty-six items that made her feel "uncomfortable" around Littler (*Id.*). Plaintiff notes that most of these items listed were in present tense (e.g. "hovers over me;" "stands at my back") and that this present tense infers a continuing pattern (*Id.*). Plaintiff essentially asserts the same inference of a continuing pattern of retaliation (*Id.*). Plaintiff concludes from this that she has sufficiently demonstrated that the conduct she complained of was pervasive and distinguishable from the conduct complained of in *Burnett* (*Id.*).

Plaintiff also argues that the *Burnett* Court found that the physical act of the alleged harasser was more severe than the non-physical acts alleged by the plaintiff (*Id.*). Plaintiff asserts that there were many such acts of physical invasion perpetrated by Littler (*Id.*). Plaintiff complains of constant physical contact, alleging that, at one point, Littler "pinned her in" when she asked a question at her computer (*Id.*).

Plaintiff further argues that the *Williams* Court's mandate to consider the totality of the circumstances requires the Court to consider the "continuous" inappropriate actions and comments made by Littler (*Id.*). Plaintiff cites Littler's comments about the possible location of Plaintiff's tattoos, the way Plaintiff smelled, the sexual preferences of one of Plaintiff's friends and Littler's placement of his crotch in Plaintiff's face (*Id.*).

Plaintiff further argues that the Court should consider Plaintiff's knowledge of Littler's attitude and propensity for harassment, which created in Plaintiff a fear and expectation that more harassment would follow (*Id.*). Plaintiff argues that Littler's motive for "hovering" and Plaintiff's understanding about that motive contributed to the severity and pervasiveness of the hostility of the work environment (*Id.*).

Finally, Plaintiff urges the Court to refrain from separating and distinguishing which of Plaintiff's complaints should be entitled to consideration to determine whether Littler's conduct was severe or pervasive (*Id.*). Plaintiff cites the *Williams* Court's instruction on applying the totality of the circumstances test. "[T]he totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation" (*Id.*) (citing *Williams* 187 F.3d at 563).

Plaintiff concludes from this that all of her complaints must be considered by the Court in one analysis rather than "in neat little packages" (*Id.*). Given this, Plaintiff concludes that this case is distinguishable from the facts of *Burnett* and as such the evidence is sufficient to create a genuine issue of material fact concerning a hostile work environment.

■ The Court agrees with Plaintiff that there is a genuine issue of material fact concerning whether Littler's conduct created a hostile environment.

The physical invasion complained of by Plaintiff in this case is arguably more severe and less ambiguous than that complained of in *Bowman*, because, contrary to the contact in *Bowman*, (shoulder-rubbing), both of the alleged contacts here involved the harasser's genitalia (doc. 17). Further, *Bowman* only addressed situations in which the plaintiff is unable to establish a hostile work environment. This is not the case here. The Court believes that if the contacts alleged in this case were established, a reasonable finder of fact could determine that those contacts were severe enough to create a hostile work environment. Thus, the Court cannot dismiss from its analysis of the work environment physical contact involving Littler's genitalia.

Further, the Court finds this case distinguishable from *Burnett*, in that there is a genuine issue of material fact as to whether Littler's conduct was "commonplace," "ongoing," or "continuing." A rational finder of fact who believed Plaintiff's testimony that Littler initiated almost constant near physical contact with Plaintiff through persistent "hovering" could determine the existence of a hostile work environment. This is especially true if the finder of fact similarly accepted Plaintiff's allegations of Littler's inappropriate comments concerning the placement of her tattoos, her smell, and her friend's sexual orientation.

While a rational trier of fact could almost certainly accept Defendant's proposition that the small size of Plaintiff's office necessitated Littler's close physical proximity to Plaintiff, this is almost categorically a question of fact that should not be decided on summary judgment. Likewise, while Defendant may be correct that the

totality-of-the-circumstances test created by *Williams* mandates the considerations of the awards given by Littler to Plaintiff, it is equally clear that the trier of fact should be given the opportunity to evaluate the motivation behind such awards.

Thus, the Court finds that there is a genuine issue of material fact concerning the existence of a hostile work environment and the Court is precluded from granting summary judgment to Defendant on this issue.

## II. DEFENDANT'S AFFIRMATIVE DEFENSE

Having decided that there is a genuine issue of material fact concerning the existence of a hostile work environment, the Court now turns to the question of whether an affirmative defense is available to Defendant making summary judgment in its favor appropriate.

The Supreme Court, in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), set forth the elements an employer must satisfy to establish an affirmative defense in a hostile work environment case where there were no tangible employment actions taken.

The employer must establish that 1) the employer exercised reasonable care to prevent and correct any sexually harassing behavior, and 2) the plaintiff employee unreasonably failed to take advantage of the preventive or corrective opportunities. *Id.*

Defendant argues that *Faragher* and *Ellerth* along with *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 263 (5th Cir. 1999), only modify and do not reject the absence of automatic liability for employers as set forth in *Meritor,* 477 U.S. at 57, 106 S.Ct. 2399 (doc. 14). Defendant further argues that the *Indest* Court distin-

guished the facts of that case, where an employee did take advantage of an employer's sexual harassment policy and the employer took prompt remedial action, from *Faragher* and *Ellerth.* The *Indest* Court determined that when an employer, upon complaint of an employee, responds promptly and effectively, exposure to vicarious liability should be limited because "the company forestalled the creation of a hostile environment." (*Id.*) (citing *Indest* at 265).

Defendant maintains that Plaintiff's complaint is that it did not fire Littler. In response, to this alleged complaint, Defendant points to *Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 874 (6th Cir. 1997) as support for the proposition that an employee is not entitled to dictate the type of remedial action an employer should take. Defendant also argues that *Blankenship* only creates liability resulting from an employers response to sexual harassment if "its action manifests indifference or unreasonableness in light of facts the employer knew or should have known." *Id.* at 873.

Defendant argues that its response to Plaintiff's complaint about sexual harassment was prompt and effective (*Id.*). Defendant points to Corrigan's meeting with Plaintiff the next business day after she complained to Pemberton of Littler's conduct (*Id.*). Defendant also observes that Corrigan immediately contacted Arends, in the Human Resources Department for the purpose of initiating an investigation of Plaintiff's complaints (*Id.*). Further, Defendant asserts that Arends flew from Chicago to Cincinnati to conduct interviews in furtherance of the investigation and reviewing Littler's personnel file (*Id.*). Finally, Defendant asserts that Corrigan decided to issue a final written warning to Littler for the duration of his employment prohibiting him from engaging in sexually harassing conduct and ordered Littler to

attend a gender sensitivity training course (*Id.*). Defendant concludes from these facts that it took prompt and effective remedial actions and thus successfully raised an affirmative defense to vicarious liability (*Id.*).

Plaintiff argues that Defendant had a duty to prevent sexual harassment rather than merely take corrective action (doc. 17) (citing *Williams* at 187 F.3d at 561). Plaintiff further argues that Defendant failed to prevent incidents of sexual harassment perpetrated by Littler despite the fact that it had knowledge of Littler's propensity toward sexual harassment of DHL employees (*Id.*). To establish this knowledge, Plaintiff points to the testimony of Corrigan that he remembered seeing a corrective action against Littler involving an inappropriate comment about a blouse or a bra (*Id.*). Plaintiff also points to a disciplinary action taken against Littler in January of 1990 involving instances of sexual harassment which resulted in the Defendant's issuance of the first of two documents entitled "final warning" (*Id.*). Finally, Plaintiff charges the Defendant with such knowledge based on records of seven different complaints from seven different female employees regarding harassment by Littler (*Id.*).

Plaintiff concludes that, given the fact that Defendant allowed Littler to remain in a position where he supervised women when it had knowledge of Littler's proclivity for sexual harassment, any remedial action it took was ineffective (*Id.*).

Plaintiff further argues that Defendant failed to properly investigate her allegations of Littler's physical invasion of her personal space and that Defendant failed to protect her from further invasions because it insisted that Littler remain in his position as her supervisor (*Id.*).

■ The Court concludes that Plaintiff has demonstrated a genuine issue of material fact as to whether Defendant suc-cessfully raised an affirmative defense to liability for the conduct of one of its supervisors.

Defendant's reliance on *Indest* is misplaced because it requires Defendant to presuppose that its actions were prompt and effective. A question like this is almost always a question of fact as it requires an inquiry into the nature of the work environment resulting from the actions taken by Defendant. Defendant's reliance on *Blankenship* is likewise misplaced. The *Blankenship* Court clearly distinguished cases involving harassment by co-worker as opposed to harassment perpetrated by a supervisor, characterizing employer liability in these two opposing situations as "markedly different." 123 F.3d at 873.

The Sixth Circuit, in *Pierce v. Commonwealth Life Insurance Company*, 40 F.3d 796, 804 (1994) cautioned that in cases like the one before the Court, where a supervisor had been charged with sexual harassment, allowing such supervisor, who could be considered an agent under Title VII, to continue supervising the plaintiff, risks the possibility that he "might again violate its sexual harassment policy, though without its specific knowledge" therefore exposing the defendant to further liability. These cases indicate that, in cases involving harassment by a supervisor, remedial action taken by a supervisor will be evaluated by a much stricter standard than that posited by Defendant.

Given Littler's alleged history and the number of women who complained about harassment, it is quite possible that a finder of fact could determine that Defendant's failure to terminate Littler after the second recorded incident of sexual harassment or its failure to remove Plaintiff from the supervision of the person about whom she complained of sexual harassment did not effectively neutralize the hostile work environment.

## III. RETALIATION CLAIM

A Plaintiff can prove actionable retaliation by demonstrating the following

1. She engaged in an activity protected by Title VII 2. This exercise of protected rights was known by Defendant 3. Defendant took adverse employment action after the exercise or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and 4. There was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792–793 (6th Cir.2000).

Plaintiff argues and Defendant agrees that Plaintiff satisfies the first two of these requirements (docs.14, 17). Plaintiff further argues that she meets the next two elements also. Plaintiff argues that Defendant's insistence that Littler continue as her supervisor and conduct her evaluation amounted to adverse employment action and allowed severe and pervasive retaliatory acts against Plaintiff (doc. 17). Plaintiff also points to Littler's practice of communicating with her only through written notes, rearranging files, excluding her from meetings and his failure to supply her with a uniform as evidence of retaliation (*Id.*). Plaintiff concludes from this that there is a genuine issue of material fact concerning whether Defendant retaliated against her in response to her charges of sexual harassment.

Defendant asserts that the job duties about which Plaintiff raised concerns were merely operational issues and did not constitute adverse job action against her (doc. 14). Defendant further argues that these allegations had been raised by Plaintiff in her original complaint and cannot be said to have been motivated by the complaint itself (*Id.*). Finally, Defendant argues that because Plaintiff resigned before she was presented with her final evaluation, no perceived mistakes or unfairness included in that evaluation can be considered adverse employment action (*Id.*). Defendant concludes from this that Plaintiff cannot sustain a *prima facie* case of retaliation.

The Court finds there is a genuine issue of material fact regarding the existence of retaliation against Plaintiff for her complaint.

Again, the finder of fact must be given the opportunity to decide whether the actions taken by Littler (i.e. his alleged refusal to communicate with Plaintiff through anything other than written notes and his allegedly successful attempt to encourage the male courier to do the same) were in response to Plaintiff's complaint and constituted retaliation. Likewise the question of Littler's motivation for the "operational" changes he made to Plaintiff's job and job duties is factual and must be left to the finder of fact.

## CONCLUSION

The Court finds that there is a genuine issue of material fact concerning the existence of a hostile work environment created by the actions of Plaintiff's supervisor. Further, the Court finds that there is a genuine issue of material fact as to whether Defendant has an affirmative defense such that it can escape liability for Littler's conduct. Finally, the Court finds there is a genuine issue of material fact as to whether Defendant's actions constituted retaliation in the wake of Plaintiff's complaints. Summary Judgment is thus inappropriate.

The Court, therefore, hereby DENIES Defendant's Motion for Summary Judgment (doc. 14).

SO ORDERED.