123 F.3d 868
 75 Fair Empl.Prac.Cas. (BNA) 1351,
71 Empl. Prac. Dec. P 44,965
Leanna C. BLANKENSHIP, Plaintiff-Appellant,
Amy E. Helton, formerly known as Amy E. Marshall, Plaintiff,
v.
PARKE CARE CENTERS, INC., doing business as Barbara Parke
Convalescent Center, Defendant-Appellee,
Walter Malcom, Defendant,
Westchester Management Company, Defendant-Appellee.
 No. 96-3084.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 5, 1996.
Decided Aug. 22, 1997.
 
 Katharine C. Weber (argued and briefed), Curtis L. Cornett (briefed), Cors & Bassett, Cincinnati, OH, for Plaintiffs-Appellants.
 Mark J. Stepaniak (argued and briefed), Gregory P. Rogers (briefed), Taft, Stettinius & Hollister, Cincinnati, OH, for Defendants-Appellees.
 Before: ENGEL, MERRITT, and RYAN, Circuit Judges.
 ENGEL, J., delivered the opinion of the court. MERRITT (p. 875), and RYAN (pp. 875-77), JJ., delivered separate concurring opinions.
 
 OPINION
 
 1
 ENGEL, Circuit Judge.
 
 
 2
 Plaintiff Leanna Blankenship appeals the district court's grant of summary judgment to defendants Parke Care Centers, Inc., and Westchester Management Company (collectively "Parke") in her suit based on claims of sexual harassment, assault and battery, and intentional infliction of emotional distress. Blankenship alleged that the conduct of a fellow Parke employee created a hostile work environment. The district court held that regardless of the severity of that employee's conduct, Blankenship failed to establish the element of "respondeat superior" necessary to hold Parke liable. We affirm.
 
 I.
 
 3
 Blankenship, then 17, was employed as a dietary aide at one of Parke's nursing homes as part of a work-study program through her high school. She started work on September 13, 1993, six weeks after Parke hired Walter Malcom, 37, as a janitor for the same nursing home. Parke knew that Malcom had a history of substance abuse and that he had once been convicted of carrying a concealed weapon. Soon after Blankenship started working, she experienced several unwanted sexual advances by Malcom. On October 3, she complained to her immediate supervisor, Jacquelyn Sullivan. At Sullivan's request, Blankenship prepared a written statement on October 4 that noted, in five separate incidents, a total of four kisses on the cheek, a tickle, three hugs, and a declaration by Malcom that he was "falling in love."
 
 
 4
 In response, Sullivan asked all the members of the dietary department if they had witnessed any of this behavior; they all said no. She met with Judith Fadden, the director of nursing, and Mamie Lee, Malcom's immediate supervisor. This group formulated an "observation network" designed to separate Malcom and Blankenship and to keep an eye out for trouble: Malcom's work area was moved to minimize his interaction with Blankenship. Lee was instructed to check on Malcom's whereabouts and behavior every so often and Sullivan was to keep Blankenship as close to the kitchen as possible, so that she would not be alone. As a result of Blankenship's complaint, Sullivan also began to walk her to her car after work. She also asked Blankenship at the end of every day if she had had any problems with Malcom. None of the administrators confronted Malcom in any way.
 
 
 5
 Within a week or so, Blankenship suffered a further incident in which Malcom grabbed her breasts from behind. She mentioned this to Sullivan, who said she would see what could be done.[1] Then, apparently at a separate time, Malcom asked Blankenship if he could take her out; she declined.
 
 
 6
 On October 17, when she returned to work after a few days off, Blankenship filed another written complaint with Sullivan, in which she mentioned only that Malcom had asked her out--not the breast-grabbing incident. On the same day, Sullivan received a complaint from another dietary aide, Amy Marshall. Marshall complained of lewd touching, gestures, and language on the part of Malcom. Responding to these complaints, Alice Kalota, the chief administrator of the nursing home, along with Fadden and Lee, met with Malcom, who denied any wrongdoing. The administrators issued him the following warning on October 18:
 
 
 7
 We have had two written complaint[s] against you for harassment by females. This is your one & only warning. Harassment of any kind by an employee to another employee absolutely will not be tolerated. Any further occurr[e]nce will result in your immediate termination.
 
 
 8
 (J.A. at 406.)
 
 
 9
 On October 22, Blankenship became upset at work because Malcom "kept coming around" her. She spoke with Sullivan, who gave her permission to leave early. Blankenship's mother came to pick her up and unsuccessfully tried to discuss the situation with Kalota. Kalota ended up meeting with Blankenship, Fadden, and Sullivan. Blankenship said that no specific incident had occurred since Malcom asked to take her out but that he was "around" her and she did not want to be near him. Kalota told Blankenship that she could not guarantee that Blankenship could work without ever coming into contact with Malcom. If she could not accept that, Kalota said, Blankenship would have to resign. Blankenship chose to resign, and she went home for good.
 
 
 10
 Blankenship sued Parke on federal and state claims of sexual harassment based on a hostile work environment, and on state claims of assault and battery and intentional infliction of emotional distress; she did not sue for wrongful termination or constructive discharge. The district court granted Parke's motion for summary judgment, holding that even if Blankenship could prove the substantive elements of a hostile work environment claim, she could not establish Parke's liability under the respondeat superior doctrine. The district court found no evidence to support the purely state law claims. Blankenship does not contest that finding; she appeals the court's holding only as to sexual harassment.
 
 II.
 
 11
 We review the district court's grant of summary judgment de novo. Kauffman v. Allied Signal, Inc., 970 F.2d 178, 182 (6th Cir.1992). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying Rule 56(c), we view the evidence in the light most favorable to the nonmoving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986).
 
 
 12
 Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a)(1). Courts have recognized two types of workplace sexual harassment as constituting discrimination on the basis of sex: quid pro quo harassment, in which a supervisor requests sexual favors in exchange for job benefits, and "hostile work environment" harassment, in which a pervasive atmosphere of sexual harassment creates an objectively hostile work environment. Rabidue v. Osceola Refining Co., 805 F.2d 611, 618-19 (6th Cir.1986).[2] Blankenship has alleged the hostile work environment strain of sexual harassment. Hostile work environment cases distinguish between harassment by supervisors and harassment by co-workers. Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803-04 (6th Cir.1994). Because Malcom had no supervisory power over Blankenship, we will apply the law of co-worker harassment.
 
 
 13
 To prevail on her claim against Parke, Blankenship must show that (1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) Parke "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." Fleenor v. Hewitt Soap Co., 81 F.3d 48, 50 (6th Cir.) (quoting Rabidue, 805 F.2d at 621), cert. denied, --- U.S.----, 117 S.Ct. 170, 136 L.Ed.2d 112 (1996).
 
 
 14
 Although the district court strongly suggested that Blankenship's claim might fail on the fourth element, it rested its grant of summary judgment on the fifth element (hereinafter "the Rabidue standard"), which it labeled as "respondeat superior liability." We used to describe an employer's liability in this situation as arising under the respondeat superior doctrine, but now we have noted the inaccuracy of that characterization. Pierce, 40 F.3d at 804 n. 11. In co-worker harassment cases, the employer is liable, if at all, directly, not derivatively. Id.; see also Fleenor, 81 F.3d at 50.
 
 
 15
 The Rabidue standard has two distinct parts. We need not concern ourselves with whether Parke "knew or should have known" of the alleged harassment. It is undisputed that Parke knew about Blankenship's complaints, with the possible exception of the breast-grabbing incident. We instead focus on whether Parke "failed to implement prompt and appropriate corrective action." The promptness of Parke's various responses to Blankenship's complaints was evident; the dispute centers on their appropriateness.
 
 
 16
 We find little guidance in Rabidue as to what standard we should use to measure the appropriateness of the corrective action, other than a directive to proceed on a case-by-case basis. 805 F.2d at 621. The origin of the phrase "appropriate corrective action" is an EEOC regulation that does not describe what sort of action is appropriate. 29 C.F.R. § 1604.11(d). Rabidue also relied on decisions from several other circuits. One of those, Katz v. Dole, 709 F.2d 251 (4th Cir.1983), provided some guidance, noting that the corrective action must be "reasonably calculated to end the harassment." Id. at 256.
 
 
 17
 In Bell v. Chesapeake & Ohio Railway, 929 F.2d 220 (6th Cir.1991), we applied the "prompt and appropriate corrective action" standard to a case of alleged racial harassment by an employee's co-workers. We noted that the appropriateness of a response depends on the frequency and severity of the alleged harassment. In affirming the dismissal of the plaintiff's case, we stated that although the employer's reaction to the alleged harassment was weaker than the plaintiff would have liked, the employer's actions did not manifest "culpable indifference" to the harassment. Id. at 225. The word "indifference" implies a more relaxed standard for employers than does Katz's statement that corrective action must be "reasonabl[e]." Katz appears to contemplate an objective standard, whereas Bell would be consistent with a subjective standard. Neither case elaborates on the standard, though; indeed, Bell begs the ultimate question of what sort of "indifference" is "culpable."
 
 
 18
 In defining the employer's duties in the present case, we must keep in mind that the alleged harasser was not plaintiff's supervisor. When the harasser is a co-worker, the standard for determining employer liability is "markedly different" from that applicable to supervisors, and is not based upon the doctrine of respondeat superior. See Pierce, 40 F.3d at 803-04. As discussed above, the employer's liability in cases of co-worker harassment is direct, not derivative; the employer is being held directly responsible for its own acts or omissions. Pierce, 40 F.3d at 804 n. 11. Thus, when an employer responds to charges of co-worker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment. Upon the facts before the district court, the employer's good-faith response was entirely sufficient to escape liability under the Rabidue standard. See also Spicer v. Commonwealth of Va. Dep't of Corr., 66 F.3d 705, 710 (4 th Cir.1995) (en banc ) (employer liable for co-worker sexual harassment "only if no adequate remedial action is taken."); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir.1995) (employer generally not liable unless "the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it."). There is a singular lack of evidence to refute the employer's claim that its actions were in good faith. Given the circumstances before it, there was little else, if anything it could do.
 
 
 19
 We recognize that our conclusion creates some tension with the first part of the Rabidue test, which asks whether the employer "knew or should have known" of the charged harassment. That language establishes an objective standard as to the employer's awareness. In essence, it equates negligent ignorance of the existence of harassment with intentional discrimination. When Rabidue was written, we still viewed the employer's liability in co-worker harassment cases as arising under the respondeat superior doctrine, so the awkward equation of negligence with intent was not present: if the employer was negligent, it was held responsible for its employees' intentional discrimination, even if it had not itself intentionally discriminated. Now that we understand an employer's liability to be direct, however, the continued validity of the "knew or should have known" language in Rabidue relies on a sort of legal fiction: because harassment is an especially invidious form of discrimination, as to which employers should be particularly vigilant, negligence as to the existence of harassment can be serious enough to constitute an intentional act of discrimination.
 
 
 20
 Once an employer is aware of and responds to charges of sexual harassment, though, mere negligence as to the content of the response cannot be enough to make the employer liable. When an employer responds with good-faith remedial action, we cannot say that the employer has itself committed an act of discrimination. In sum, although negligence as to the existence of harassment may be enough, under Rabidue, for an employer to incur liability for discrimination, negligence in the fashioning of a remedy is not. When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.
 
 A. The October 4 and October 17 complaints
 
 21
 As to her two written complaints, Blankenship asserts that Parke should have taken more drastic action to separate her from Malcom. It should have confronted Malcom right away, she argues, and either transferred or terminated him. As Parke notes, though, a harassment victim may not dictate an employer's action against a co-worker. See Bell, 929 F.2d at 225. Parke argues that because of the lack of corroboration of the complaints, its actions in response to each were appropriate.
 
 
 22
 After the first complaint, Parke took several steps to protect Blankenship. Although hindsight shows that these measures may not have been sufficient, they were appropriate at the time and easily satisfy the "good faith" standard we have discussed above. See Mullholand v. Harris Corp., No. 94-3725, 1995 WL 730466, at * 3 (6th Cir. Dec. 8, 1995) ("Given that this was the first complaint ..., it would hardly have been sensible to take serious action without investigation at this time."), cert. denied, 517 U.S. 1172, 116 S.Ct. 1578, 134 L.Ed.2d 676 (1996). After the second complaint and the intervening breast-grabbing incident, Parke threatened Malcom with termination. This response was both prompt and appropriate. See Fleenor, 81 F.3d at 50-51; Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 427 (8th Cir.1984) (finding that investigation into alleged harassment was "appropriate corrective action" and that employer was not required to fire harasser).
 
 B. Blankenship's resignation
 
 23
 The most troubling facts of this case are those surrounding Blankenship's resignation. Blankenship argues that Parke unreasonably forced her to resign. Because she has not alleged wrongful termination or constructive discharge, this argument at first glance appears out of place. The events of October 22 can, however, be analyzed under Rabidue. Blankenship complained to Sullivan and to Kalota that day that Malcom was "around" her and that she did not want to work in the same building with him. Parke's response was that Blankenship had either to accept the status quo or to resign. That response, as such, was prompt; we must decide whether it was appropriate under the good-faith standard. Plainly it was.
 
 
 24
 The only thing that Blankenship could complain about with respect to Malcom on October 22 was that he was "around" her. No misconduct was cited on that day and therefore there was nothing to merit further censure by Parke. The workplace involved here was relatively intimate in all events and Kalota could very well have concluded that it was at least difficult if not impossible to guarantee that the two could never escape an occasional contact. Perhaps Kalota could have handled the meeting with Blankenship and her mother more adroitly, but clearly the parties had reached an impasse. She had already implemented several steps in good faith to correct the problem; the confrontation on October 22, since it did not involve any untoward conduct on Malcom's part, could not occasion any further disciplinary action against Malcom himself.
 
 
 25
 While our holding can, we are satisfied, stand on its own, it is fortified by one other circumstance in this case which we believe could not realistically be ignored by Parke. Blankenship was female and white. Malcom was male and black. As supervisor, Parke was charged by Title VII with a duty not to discriminate against employees either on account of sex or on account of race. This duty would extend both to Blankenship and to Malcom. Not one of the actions alleged as harassment on Malcom's part was supported by an independent eyewitness. For his part, Malcom denied the acts charged. It is true that by the time of Blankenship's second complaint, co-employee Marshall had also claimed she was harassed by Malcom. Again, however, there was no independent eyewitness corroboration that we are aware of and Malcom denied these charges also. Although we do not attempt to quantify this circumstance in a legal way, it would be unfair indeed to ignore the very practical dilemma which presented itself to Sullivan. The propriety of her conduct, her good faith, and her freedom from any intent to discriminate are manifest. Considering the facts of this case up to and including October 22, we find that Parke's response did not, as a matter of law, evidence the kind of discriminatory conduct on its part necessary to support the charge against it. Parke was aware of Blankenship's complaints and had already implemented several steps in good faith to correct the problem. Preventing Malcom from coming near Blankenship was not yet a necessary step. If Malcom's harassment of Blankenship had further escalated, Parke might have been under a duty to prevent Malcom from being near Blankenship--indeed, it might have been under a duty to fire him. See Bell, 929 F.2d at 224 ("[A]n appropriate corrective response will vary according to the frequency and severity of the alleged harassment."). Considering the facts of this case up to and including October 22, however, Parke's response, though perhaps subject to criticism for being obstinate, as a matter of law did not cross the initial threshold necessary to support a finding of discrimination.
 
 III.
 
 26
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 27
 MERRITT, Circuit Judge, concurring.
 
 
 28
 I concur in Judge Engel's opinion for the Court. In light of Judge Ryan's separate concurring opinion I should comment on my previous statement indicating that in coworker sexual harassment cases "direct negligence," as distinguished from "respondeat superior," is sufficient to establish employer liability. See Fleenor v. Hewitt Soap Co., 81 F.3d 48, 50 (6th Cir.1996). Having thought further about the matter, I do not believe that "negligence" is a very good shorthand label for liability in such cases. "Intentional" wrongdoing is probably not a very good label either.
 
 
 29
 Quoting from a previous Sixth Circuit case, I said in Fleenor that employer liability is established in coworker sexual harassment cases when "the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." I think this should be the general standard, whatever label we put upon it--negligence, recklessness, intentional, good faith, bad faith, and so on. Despite what I said in the Fleenor case, I do not think we should take our eye off the ball by insisting on a label drawn from the common law for this statutory tort which was unknown to the common law. The standard seems to me somewhere in between "negligence" and "intentional" wrongdoing. Perhaps we could call it "deliberate indifference" by the employer to the sexual harassment in its workplace if we must put a label or shorthand rhetorical characterization on the employer's conduct. Perhaps "deliberate indifference" catches the meaning of the standard better than older common law concepts. Call it what you will, the standard quoted above is the one used in Judge Engel's opinion in paragraph 13.
 
 
 30
 This area of employer liability for coworker sexual advances is hard to get a good handle on, and I think Judge Engel's opinion does quite well in clarifying the problem and providing a reasonable standard.
 
 
 31
 RYAN, Circuit Judge, concurring.
 
 
 32
 Defendants Parke Care Centers, Inc. and Westchester Management Company responded promptly and appropriately--that is to say, reasonably--to plaintiff Leanna Blankenship's hostile work environment allegations and therefore cannot be liable for her injuries under Title VII. Thus, the result reached by the majority is correct. However, the analysis my brother employs in reaching this result misstates the law in several respects and therefore I must concur separately.
 
 
 33
 First, the majority opinion erroneously states that, in order for an employer to be liable for coemployee hostile work environment sex discrimination, the employer must discriminate on the basis of sex. It is simply not the law that an employer's liability for sex discrimination under Title VII requires proof that the employer himself, herself, or itself is guilty of sex discrimination. And, as I shall show, the decisional authority makes that abundantly clear.
 
 
 34
 Certainly, Title VII prohibits an "employer" from discriminating on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). However, "employer" means "a person engaged in an industry affecting commerce ... and any agent of such a person ...." 42 U.S.C. § 2000e(b) (emphasis added). Although in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 72, 106 S.Ct. 2399, 2407, 91 L.Ed.2d 49 (1986), the Supreme Court declined to "issue a definitive rule on employer liability," the Court did reiterate that agency principles should provide guidance in this area. The Meritor Court then cited the Restatement (Second) of Agency §§ 219-237(1958) as a source for such guidance. Id.
 
 
 35
 Several courts have applied these agency principles, as directed by the Supreme Court, in coemployee cases. See, e.g., Faragher v. City of Boca Raton, 111 F.3d 1530, 1535 (11th Cir.1997); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1417-18 (10th Cir.1987); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir.1987). Courts have cited the Restatement (Second) of Agency § 219(2)(b) for the familiar proposition that a master may be subject to liability for the torts of his servant, even if the servant is acting outside the scope of his or her employment, if "the master was negligent or reckless." Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 577 (10th Cir.1990); Hicks, 833 F.2d at 1418. Clearly, an employee is the employer's servant. See Restatement (Second) of Agency § 2(2). Agency principles, then, hold an employer directly liable for its negligence in failing to prevent or remedy the discrimination of its agent-employee.
 
 
 36
 This theory of employer liability has been ratified many times over. "[I]t is clear, the criterion for when an employer is liable for sexual harassment is negligence ...." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 432 (7th Cir.1995) (emphasis added). In fact, this court has straightforwardly stated this principle on at least two occasions. See Fleenor v. Hewitt Soap Co., 81 F.3d 48, 50 (6th Cir.1996); Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 n. 11 (6th Cir.1994). As Judge Merritt wrote for the court in Fleenor:
 
 
 37
 Although we erroneously referred to it as "respondeat superior," we later realized that the term "respondeat superior"--which connotes derivative liability--is an incorrect label for co-worker harassment cases, where the employer is directly liable for its own negligence. This understanding, that the employer is directly not derivatively liable, and the underlying "knew or should have known" standard, are [sic] consistent with the law in other circuits. The standard is also consistent with the common law understanding of an employer's liability for the misconduct of employees.
 
 
 38
 Fleenor, 81 F.3d at 50 (emphasis added) (citations and some internal quotation marks omitted). Judge Merritt cited § 219(2)(b) of the Restatement as support for the above discussion. Id. at n. 1. And so, contrary to statements in the majority opinion, there quite simply is no requirement of intentionality under Title VII for employer liability in hostile-work-environment sex-discrimination cases.
 
 
 39
 Second, my brother errs in implying that respondeat superior liability requires negligence on the part of the employer. Clearly, it does not. See W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 69 (5th ed.1988). Under respondeat superior, an employer is liable, despite having no fault whatsoever, for the acts of its employees which are within the scope of their employment. Id. This court eventually realized that, in the Title VII hostile-work-environment context, respondeat superior was a misnomer because 1) employer negligence is a prerequisite for liability, and 2) the creation of a hostile work environment is not generally within the scope of a coworker's employment. However, our realization that liability is direct, and not vicarious, did not change the substance of the law. An employer was liable for its negligence when we were mistakenly using the term respondeat superior, and it continues to be liable for its negligence now that we do not use that misnomer. The "tension" the majority identifies is created only by its mistaken belief that direct liability under Title VII must be of the intentional variety, a belief undermined by the clear precedent demonstrating that negligence is sufficient.
 
 
 40
 Third, the majority has arbitrarily adopted a "good faith" standard for judging an employer's response to charges of sexual harassment, despite the absence of supporting case law and despite the fact that such a standard conflicts with the reasonableness analysis the majority recognizes must be applied in determining whether an employer should have known of the harassment. The majority cites no direct authority for a "good faith" standard and indeed I suggest there is none. In fact, the cases that come closest to defining the familiar "prompt and appropriate" formulation indicate that employers' remedial actions must be "reasonably likely to" or be "reasonably calculated to" end the harassment. See Reynolds v. CSX Transp. Inc., 115 F.3d 860, 867 (11th Cir.1997); Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir.1997); Zirpel v. Toshiba America Info. Sys., Inc., 111 F.3d 80, 81 (8th Cir.1997); McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 480 (7th Cir.1996); Waltman v. Int'l Paper Co., 875 F.2d 468, 479 (5th Cir.1989); Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983). While, arguably, "reasonably calculated to" may be construed as compatible with either subjective good faith or with an objective reasonableness standard, the latter is preferable. That is, there seems to be no good reason to establish inconsistent rules with which to evaluate, on one hand, whether the employer should have known of the discrimination and, on the other, the propriety of its response. Negligence, or objective reasonableness, should be the common standard in both inquiries. Not only does such an interpretation avoid another "tension" of the kind my brother laments elsewhere in the majority opinion, but reasonableness is more easily ascertainable by a factfinder. In fact, those courts that have spoken unambiguously on this issue require an employer to provide a reasonable remedy. Baskerville, 50 F.3d at 432; Lopez, 831 F.2d at 1189.
 
 
 41
 Because, as a matter of law, defendants responded reasonably to plaintiff's allegations of sexual harassment by her coworker, defendants were entitled to summary judgment by the district court.
 
 
 
 [1]
 Parke disputes that this event happened and that Blankenship reported it to Sullivan, but recognizes that because the district court granted it summary judgment, the facts must be considered in the light most favorable to Blankenship
 
 
 [2]
 One part of Rabidue was abrogated by Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), but the rest of the case is still valid law. See, e.g., Fleenor v. Hewitt Soap Co., 81 F.3d 48, 50 (6th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 170, 136 L.Ed.2d 112 (1996)