Clayton H. MARTIN, Jr., Plaintiff,

v.

BOEING–OAK RIDGE COMPANY, Defendant.

No. 3:01–CV–113.

United States District Court,
E.D. Tennessee.
Knoxville Division.

Dec. 12, 2002.

Robert L Jolley, Jr, Knoxville, TN, M
Robin Repass, Ogborn, Summerlin & Og-
born, LLC, Denver, CO, for Clayton H
Martin, Jr, plaintiff.

John C Burgin, Jr, Edward G Phillips,
Edwin H Rayson, Jr, Kramer, Rayson,

Leake, Rodgers and Morgan, Knoxville, TN, for Boeing–Oak Ridge Company, defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

■ This civil action is before the court for consideration of the motion for summary judgment filed by defendant, Boeing–Oak Ridge Company, [doc. 14]. Plaintiff has responded in opposition to the motion [doc. 18, 19], and defendant has submitted a reply [doc. 22]. Plaintiff has filed this action for alleged violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981; and The Tennessee Human Rights Act ("THRA"), Tenn.Code Ann. § 4–21–101, *et seq.*[1] For the reasons stated herein, the motion will be granted, and this case will be dismissed.

## I.

### Factual Background

Plaintiff is an African American who was hired by defendant on September 24, 1991, as a Production Machine Operator. On September 13, 1993, plaintiff was made a Machinist. Defendant manufactures commercial aircraft parts and has several hundred employees subject to a collective bargaining agreement ("CBA") with the International Association of Machinists ("the Union").

In 1993, an hourly employee, Anthony Collins ("Collins"), kicked the plaintiff and verbally abused him. Plaintiff reported the incident to his supervisor who resolved the matter including obtaining an apology from Collins, something plaintiff had re-

quested. In his deposition, plaintiff acknowledged that the matter had been resolved as he had requested.

Several years later in 1998, two hourly employees, Tim Johnston ("Johnston") and David Spears ("Spears"), allegedly made racial remarks in the context of the Jasper, Texas incident in which an African American man was chained and pulled behind a vehicle to his death. Johnston is alleged to have told the plaintiff that he had a chain that would "just fit" him. Spears is alleged to have said prior to this incident that the Knoxville police were getting coon dogs because they were having trouble with "coons."

Plaintiff never reported the Spears remark to management. The remark appeared in plaintiff's EEOC charge dated January 10, 2000. Plaintiff did not report the Johnston remark until June 1999, a year after it was made. It came to light while plaintiff was being questioned in connection with the incident involving Elmer Carver ("Carver"), the facts of which are set out below. After plaintiff's EEOC charge was made, the EEOC Specialist for defendant interviewed Johnston and Spears. Johnston denied making the remark, and Spears said the "coon dogs" remark was made by plaintiff, who repeated it several times.

The Carver incident occurred June 23, 1999. Carver, a machinist, brought pictures of a KKK rally to the plant and showed them to plaintiff. The incident was witnessed by another machinist, Bob Clark ("Clark"). Carver asked plaintiff if he wanted the pictures and if he wanted to

1. The claims raised under the THRA and § 1981 are analyzed under the same framework as Title VII. *Newman v. Federal Express Corp.*, 266 F.3d 401, 406 (6th Cir.2001); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir.2001) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992); *Raines v.* *Shoney's, Inc.*, 909 F.Supp. 1070 (E.D.Tenn. 1995); *Bruce v. W. Auto Supply Co.*, 669 S.W.2d 95 (Tenn.Ct.App.1984)). Thus, the court's analysis and conclusions concerning plaintiff's Title VII claims applies equally to and is dispositive of the claims brought under § 1981 and the THRA.

join. Plaintiff's response was "hell no." Carver put the pictures on a trash can. Plaintiff later retrieved them and reported the incident to the EEO Manager. The security office immediately questioned Carver and Clark. Carver's explanation was that he and plaintiff had discussed issues over the years and he had seen the KKK material on his home computer and wanted to discuss it with plaintiff. He denied any intent to offend plaintiff.

Plaintiff was interviewed by the Labor Relations Manager, Marvin Thomas ("Thomas"). Plaintiff said that Carver made racial jokes and the joke had gone too far and he was offended.[2] Plaintiff testified in his deposition that he did not want Carver fired. Carver was suspended and then terminated June 30, 1999. The Union filed a grievance which was denied. The Union pursued the matter to arbitration. Plaintiff testified as a witness for defendant at the arbitration. The arbitrator upheld the discharge by a decision dated April 18, 2000.[3]

In the spring of 1999, Don Long ("Long") became defendant's plant manager. Via a letter dated May 6, 1999, Long set out defendant's policies concerning harassment and equal opportunity. The letter was entitled "A Harassment–Free Workplace" and was distributed to all employees. It made clear defendant's zero-tolerance for harassment and other inappropriate conduct and stated, "Our workplace must be a safe and supportive environment where everyone is treated with respect, decency and civility."

An Employee Information Bulletin entitled "Zero Tolerance for Company Policy Violations" was posted May 13, 1999. The bulletin stressed defendant's commitment to a workplace free of harassment. During the time the Carver incident was under investigation, Long issued a letter to all employees dated June 24, 1999, entitled "A Harassment–Free Workplace Policy Reaffirmation." Long wrote:

> Recently some racially offensive pictures (a Ku Klux Klan rally) were brought into the workplace. As a result of this incident, an investigation is currently being conducted. This information bulletin is distributed to reemphasize the Company's harassment-free workplace policy.
>
> The Company has adopted a zero-tolerance policy toward harassment and other inappropriate conduct that makes our work environment intimidating or harassing. As outlined, in numerous information Bulletins and Policy statements, Ethnic jokes, offensive literature and racial slurs, even "among friends," have no place within the work environment. Our response to this type of behavior will be both swift and direct. The fact that "everyone" laughed, "no one" objected or you "didn't mean it" are not acceptable explanations.

The record reflects that other employees not involved with plaintiff were disciplined for inappropriate racial conduct. In October 1995, an employee showed a hangman's noose to a black female employee. The incident was reported and the offending employee was given a three-day suspension without pay. In 1998, an employee with a chain gang device displayed it to other employees. The device was placed at the work station of an African American employee. The incident came to the attention of management who

---

2. The record reflects that plaintiff has a reputation for telling racial and sexual jokes.

3. In deposition, plaintiff testified that before the KKK incident, Carver threatened to kill him. According to plaintiff, he never reported the incident because Carver might get fired. The incident is not reflected in his EEOC charge, and plaintiff did not refer to it when he testified at the arbitration.

gave the offending employee a five-day suspension without pay. Four front-line supervisors apparently considered the action a joke and did not report it. They too received a five-day suspension without pay. Plaintiff testified in deposition that he was aware of these actions.

In late August of 1999, plaintiff complained to Thomas that a retirement party was held in the plant for a retiring machinist to which neither he nor any black employee was invited. Plaintiff told Thomas he thought supervisors were involved. Thomas investigated and learned that the gathering had taken place during the lunch break and that it had been given by hourly employees. Supervisors did not sponsor the occasion, but two supervisors came by to shake hands with the person retiring. Thomas also learned that a black employee had been invited. This information was passed on to plaintiff by Thomas. Plaintiff said he did not want anything more done.

Subsequent to the Carver incident, plaintiff found that someone had poured oil and sardine oil at his work station. According to plaintiff's EEOC charge, it was on September 17, 1999. Plaintiff reported the incident to Thomas who discussed it with him. The offending party could not be found. Thomas conveyed the information to the Manager of the Human Resources Department, Mike Reid ("Reid"). Defendant was at that time looking into the fact that some employees had Confederate flags displayed on or in their tool boxes. Defendant determined that displaying such an insignia was inappropriate for the workplace and instructed supervisors to inform employees of that fact. Guards were told to inform the Human Resources Department of any vehicles carrying the insignia. As recently as May 2002, employee Spears was told to remove a Confederate insignia from his truck if he wanted to continue using the plant parking lot. Spears complied.

One of plaintiff's claims is that he has been acting as a "group leader" since May 1999 but has not been paid the additional hourly rate for performing the work, which according to plaintiff is 50 cents per hour. According to plaintiff, in mid–1998 he was asked by his supervisor to learn the job of a machinist, Doug Eldridge ("Eldridge"), who was planning to retire so he could assume Eldridge's place as "group leader." Eldridge retired in May 1999. The position of "Lead" is provided for in the CBA, and the defendant has the right under the CBA to assign an employee to that position. Plaintiff wrote a letter dated August 30, 1999, to defendant officials concerning this matter.

Plaintiff met with Jerre Armstrong ("Armstrong"), the Operations Manager, twice about this issue, once before and once after plaintiff's letter. Eldrige's personnel records demonstrate that he was never a Lead and was not paid the additional 35 cents per hour, not 50 cents as contended by plaintiff, for doing Lead work. Plaintiff was informed of this fact. Armstrong and machinist supervisor Steve Williams ("Williams") met with plaintiff twice to explain the work he was asked to do was not lead work and that like all machinists he was to assist others with their work. Armstrong told plaintiff in September 1999 that the area did not need a lead.

Plaintiff's supervisor changed in the fall of 1999 when Mike Purcell ("Purcell") became the machinist supervisor. In December 1999, Purcell was assigned additional responsibilities which required that he have lead employees in three areas. Employee Burt Galbraith ("Galbraith"), a utility operator, was selected as Lead in plaintiff's work area. The record reflects that Galbraith was chosen because of his leadership abilities, experience, and the fact that he had served as a process engi-

neer for the machine shop. Galbraith had more experience and seniority than plaintiff. He served as Lead from January 3, 2000, through October 19, 2000. There has not been a Lead since then.

Plaintiff contends that on November 8, 1999, he found a "watermelon flavored Jolly Rancher sticking out of his tool box." Plaintiff reported matter to Thomas and told him he did not know who did it.

In January 2000, plaintiff was moved to the second shift which in his opinion is a less desirable shift. He thought he was moved to get him "out of harm's way—away from them other guys, yeah." While on the second shift, plaintiff had a problem at the tool shop where he was not attended to in the proper order. Plaintiff's supervisor promptly corrected this situation. Plaintiff made no other complaints while on the second shift, and he returned to the first shift in January 2001.

Affidavit testimony from Armstrong and Purcell reflects that the transfer of plaintiff to the second shift was not because he was being harassed but because of a need to balance and strengthen the second shift. A reduction in force in November 1999 and scheduled retirements in January 2000 resulted in the second shift losing seven machinists. Twelve machinists from the third shift were moved to the second shift; two machinists from the first shift were moved to the second shift. Plaintiff was one of the two moved from the first shift. He was given a choice of the second or third shift, and he chose the second. The transfers were made according to the CBA.

Though not in the complaint, plaintiff's EEOC charge recites an incident of alleged harassment involving Purcell. On November 11, 1999, plaintiff was away from this work station before, during, and after a break on a personal call. Purcell saw this and warned plaintiff that if it happened again he would "write me up." In his deposition, plaintiff testified that when he became acquainted with Purcell "he evened things out" and acknowledged that Purcell was "shooting straight" with him. Purcell's affidavit reflects that his actions toward the plaintiff were the same as for any employee away from his work place without permission.

Plaintiff also alleges in his EEOC charge but not the complaint that he was harassed when he was told to remove the picture of "a (female) friend in a bathing suit." In his deposition, plaintiff testified regarding the incident that at the time he considered it harassment but said "the guy was just doing me a favor in case somebody were to come by and took it the wrong way" and "after I thought about it, I said, 'All I need is a complaint to go up front, about something out of the way.'" There is a company policy against sexual harassment which identifies "pin-up" pictures as an example of sexual harassment, and this was in Long's May 6, 1999, letter to all employees entitled "A Harassment–Free Workplace."

J.R. Henry of security interviewed plaintiff on December 22, 1999, and in a signed statement identified incidents of harassment and intimidation which he said had occurred since the Carver incident. These included the oil and watermelon sucker in his work place; being spoken to by Purcell for being back late from break;[4] snubs or the cold shoulder from co-workers; and co-workers standing near his work station and making comments or whistling Dixie. For the first time plaintiff gave the names of employees involved. Prior to this time,

---

**4.** Plaintiff's statement indicates Purcell issued him three Corrective Action Memos ("CAM") in three weeks. CAMs are formal disciplinary actions. Purcell testified in an affidavit that plaintiff did not receive any CAMs in 1999.

plaintiff had spoken with Thomas who stated in an affidavit that plaintiff had told him he could not identify harassers. His affidavit also reflects that plaintiff expressed concern about conducting an investigation and that he would continue reporting incidents to Thomas and that they agreed to proceed with an investigation if plaintiff believed there was some basis for the complaint. Thomas reported plaintiff's concerns to the Threat Management Team (Human Resources and Security). A period of surveillance was undertaken but no evidence of harassment was uncovered.

Purcell testified by affidavit that while he was plaintiff's supervisor, August 1999 through January 2000 when plaintiff went to the second shift, he frequently monitored plaintiff's work area. He did not observe any problems. Purcell also stated that he spoke with his crew and told them that he did not want nor would he tolerate any improper conduct. He noted that plaintiff worked well with co-workers and displayed a "happy go lucky and upbeat" manner.

Plaintiff testified that he was followed home but eluded those following him and that his yard was trashed. He stated that this occurred once before he met with security. This information is not reflected in the information he gave to security and is not alleged in the complaint. Plaintiff did report an incident which occurred June 12, 2000. When plaintiff left at the end of his shift at about 23:03 [11:00 p.m.] he found a screw in the right rear tire of his vehicle which was parked in the company parking lot. Plaintiff gave a statement to the security officer on duty and photographs were taken. On June 23, 2000, plaintiff was interviewed by James Henry ("Henry") of security who obtained plaintiff's statement concerning the incident. Henry reported the incident to Thomas and arranged for surveillance of the parking area by security officers and surveillance equipment. Nothing further was observed or reported.

After defendant received a report on plaintiff's December 22, 1999, interview and plaintiff's EEOC charge, it went forward with interviews of those employees identified by plaintiff, others who worked in his area, and some managers. Many of the interviews reflect that plaintiff is known as someone who "loved to joke and cut up." None of the employees acknowledged being aware of harassment or threats toward plaintiff. Several indicated that they have been afraid to go near the plaintiff since the Carver incident for fear of saying something which could cost them their job or get them "caught up in what was going on." Galbraith and another hourly employee, Jack McNeal, stated that they still have a relationship with plaintiff. Galbraith also stated that some people would not have anything to do with plaintiff because of the Carver incident.

Defendant's response to the EEOC concerning plaintiff's charge refers to these interviews and states:

> Employees interviewed during the investigation stated very strongly that their estrangement from the charging party was not based on his race, but rather on what is perceived as betrayal of a co-worker. The cultural values of the workforce and the strong union environment appear to strongly influence the beliefs of these employees. The company is working to correct this situation with the help of an organizational development specialist and the continuing support of the area management and supervision.

The response also indicates that since September 1999, all employees have received diversity training on valuing differences. Plaintiff remains employed at defendant's Oak Ridge, Tennessee facility.

## II.

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)). The moving party may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553. Although the moving party has the initial burden, that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554 (emphasis in original).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

## III.

### *Analysis*

### A. *Time Barred Claims*

Defendant initially argued that three of plaintiff's allegations are time barred because they occurred more than 300 days from the filing of his charge of discrimination. Subsequent to the filing of defendant's initial brief, the Supreme Court decided *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In light of this case, defendant states that the one remaining discrete act that is outside the 300 day period is the fact that when plaintiff was hired in 1991, he was not made a machinist. The court agrees. This claim is well beyond the 300 day window and is time barred.

Claims under the THRA are subject to the one year statute of limitations contained in Tenn.Code Ann. § 4–21–311. *See Wade*, 259 F.3d at 464; *Weber v. Moses*, 938 S.W.2d 387, 389 (Tenn.1996). The "THRA's one year limitations period for bringing a direct court action is not tolled while administrative charges are pending with the THRC or the EEOC." *Burnett v. Tyco Corp.*, 932 F.Supp. 1039, 1044 (W.D.Tenn.1996) (citations omitted); *see*

*Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481 (6th Cir.1989).

■ Section 1981 does not specify a statute of limitations. The one-year limitations period in Tenn.Code Ann. § 28–3–104 is applied which provides that a civil action brought under the federal civil rights statutes must be filed within one year after the cause of action accrues. *See Wade*, 259 F.3d at 464; *Jackson v. Richards Medical Co.*, 961 F.2d 575, 578 (6th Cir.1992). Therefore, to the extent plaintiff seeks recovery of discrete retaliatory or discriminatory acts under the THRA and § 1981 which occurred more than one year from the filing of the complaint, those claims are barred by the applicable statute of limitations.

■ The continuing violation doctrine applies to claims under the THRA and § 1981. *See Spicer v. Beaman Bottling Co.*, 937 S.W.2d 884, 889 (Tenn.1996); *Weber*, 938 S.W.2d at 391 n. 4 (Tenn.1996); *Frazier v. Heritage Fed. Bank for Sav.*, 955 S.W.2d 633, 637 n. 2 (Tenn.Ct.App. 1997). Plaintiff's parallel claims for a hostile work environment brought under the THRA and § 1981 which are outside the one year statute of limitations will be treated as those same claims are treated below under Title VII and the standard of *National Railroad Passenger Corp. v. Morgan*.

Therefore, the court will consider the 1993 kicking incident and the alleged remarks by Johnston and Spears in June 1998 as part of plaintiff's claim for a hostile work environment. The court, of course, will also consider the subsequent events related to these incidents and defendant's response to them.

### B. *Hostile Work Environment*

Plaintiff contends that he was subjected to a hostile work environment. "Hostile work environment cases distinguish between harassment by supervisors and harassment by co-workers." *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir.1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803–04 (6th Cir.1994)). Plaintiff has not alleged harassment by any of his supervisors, and he testified in deposition that his supervisors have not acted inappropriately toward him. Therefore, the court will apply the law pertaining to co-worker harassment.

■ In order to establish a *prima facie* case of hostile or abusive work environment based upon race, plaintiff must show:

1) that he is a member of a protected class;

2) that he was subjected to unwelcome racial harassment;

3) that the harassment was based on race;

4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and

5) the existence of employer liability.

*Newman v. Federal Express Corp.*, 266 F.3d 401, 405 (6th Cir.2001) (citing *Hafford. v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). The principles governing sexual harassment also govern racial harassment. *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999) (citing *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 479 (6th Cir.1989)); *see also Anderson v. Memphis City Schools Bd. of Ed.*, 75 F.Supp.2d 786, 792 (W.D.Tenn.1999) (*prima facie* case for hostile work environment under Title VII same for sex or race).

■ The conduct in the workplace must be extreme to change the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283–84, 141 L.Ed.2d 662

(1998). The hostile work environment must meet both an objective and subjective test. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The conduct must also be so severe and pervasive that it creates an environment which a reasonable person would find abusive and hostile, and the victim employee must subjectively consider the environment to be abusive. *Id.* at 21–22, 114 S.Ct. at 370. The court looks to the totality of the circumstances in determining whether a hostile work environment exists. *See Jackson*, 191 F.3d at 660.

Plaintiff's allegations of a hostile work environment include the following: that he was kicked by hourly employee Collins in 1993; that at the time of the incident in Jasper, Texas in 1998 when a black man was chained and dragged to his death, he was told by Johnston that he had a chain to fit him; that at about the same time, he was told by hourly employee Spears that the Knoxville police were getting coon dogs because they were having problems with coons; that Carver showed him pictures of the KKK rally; that Confederate insignias were displayed on employee tool boxes; that someone put sardine oil and foul smelling oil on his tool box and someone put a watermelon sucker on his tool box; that he found a screw in the right rear tire of his vehicle; and that he has been made aware of his race by comments and jokes.[5]

Plaintiff alleges certain conduct, which is neutral on its face, also contributes to a hostile work environment: that people gave him the cold shoulder and would not associate with him after the Carver incident; that Johnston was made union steward; that he was not invited to a machinist's retirement party; that Jack Smith was promoted in 1995;[6] that Armstrong stood by and watched him clean his machine at the insistence of the employee on the following shift; and that he is restricted to working on one type of machine.[7]

However, whether this conduct rises to the level of a hostile work environment is not determinative of the court's decision. Even if plaintiff has demonstrated a hostile work environment, he cannot demonstrate the fifth element of his *prima facie* case, the existence of employer liability. Therefore, for the purposes of the discussion herein only, the court will assume

**5.** This last contention is stated in plaintiff's affidavit in response to defendant's motion. However, he does not provide any specifics beyond the conclusory statement. He does not give the content, persons involved, or time frame of the alleged comments and jokes. Conclusory statements such as this do not overcome summary judgment. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

**6.** Plaintiff complains that Jack Smith was promoted to supervisor in 1995. Plaintiff alleges Smith "laughed" when plaintiff was kicked by Anthony Collins in 1993. First, there is no temporal or causal connection demonstrated between the two events. Second, the sworn statement plaintiff gave to the EEOC makes no reference to Smith laughing. In the statement, plaintiff said that "Jack Smith and Jer-ry Fillers didn't seem to like it but walked on." Plaintiff cannot create a question of fact by contradicting his own statement. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986).

**7.** Plaintiff also claims that a glass case used to display information about African Americans was vandalized June 2–3, 2002. The second affidavit of Thomas indicates that the display case has been used to display information about women, the holocaust, Hispanics, Native Americans as well as African Americans. At the time of the alleged incident, the case featured gay and lesbian pride information placed there May 29, 2002. An investigation has not determined whether it was an accident or vandalism. These circumstances do not show racial animus directed singularly toward African Americans.

plaintiff has demonstrated the existence of a hostile work environment.

■ In order to show employer liability, plaintiff must establish that his employer knew or should have known about the alleged conduct and failed to take prompt and appropriate remedial action. *Blankenship*, 123 F.3d at 872.

When the harasser is a co-worker, the standard for determining employer liability is markedly different from that applicable to supervisors, and is not based upon the doctrine of *respondeat superior* .... [T]he employer's liability in cases of co-worker harassment is direct, not derivative; the employer is being held directly responsible for its own acts or omissions. Thus, when an employer responds to charges of sexual [or racial] harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment.

*Blankenship*, 123 F.3d at 873. However, once an employer responds in good faith to charges of harassment with remedial measures, negligence in how the employer fashions the remedy is not enough to make the employer liable. *Id.* "Remedial action by the employer must be reasonably calculated to end the harassment for the employer to avoid liability." *Spells v. Cuyahoga Community College*, 889 F.Supp. 1023, 1027–28 (N.D.Ohio 1994), *aff'd.* 51 F.3d 273, 1995 WL 124306 (6th Cir.1995). When an employer implements remedial measures, it can be liable for co-worker harassment only if the remedy "exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *Blankenship*, 123 F.3d at 873. "Summary judgment is appropriate if the

employer's response does not raise a genuine issue of whether the response was appropriate." *Spells*, 889 F.Supp. at 1028. Such is the case here. Plaintiff cannot establish the fifth element of the *prima facie* case, employer liability, and therefore summary judgment is appropriate.

■ Plaintiff contends that defendant and its supervisors have shown indifference by their conduct and actions in response to his complaints. The court does not agree. There are no issues of material fact regarding the defendant's responses to plaintiff's complaints because the record reflects that defendant immediately reacted to each incident of racial harassment or misconduct reported by plaintiff and then decisively dealt with the situation in a reasonable and appropriate manner. Each time plaintiff reported an incident involving racially inappropriate conduct, an investigation was conducted and when appropriate, disciplinary action was taken. The kicking incident with Collins in 1993 was investigated, and plaintiff received the apology he requested. The chain comment allegedly made by Johnston was not reported by plaintiff until a year after it occurred, when it came to light during the Carver investigation. Spears' comment about the coon dogs was not reported to defendant and came to light in his EEOC charge of January 10, 2000. Once these incidents became known to defendant, Johnston and Spears were questioned by a security officer and the EEOC Specialist at the plant.

Through written notifications, defendant has made clear that it has a zero tolerance policy for harassment and other inappropriate conduct in the workplace. Defendant moved quickly and decisively in the Carver incident, and while that was under investigation, Long issued a letter to all employees reaffirming defendant's zero-tolerance for such conduct. Since the Car-

ver incident, diversity training on valuing differences has been given to the entire employee population and supervisors have spoken to employee groups about defendant's policies and procedures regarding diversity. These are not the actions of an employer indifferent to harassment in the workplace.

In addition, decisive disciplinary action was also taken in 1995 with the hangman's noose incident and the chain gang device incident in 1998. Those disciplined in the latter incident included supervisors who though not involved, did not report it because they considered it a joke. Defendant obviously did not find it so and acted accordingly. When plaintiff complained about the Confederate insignia being displayed, defendant agreed. Defendant has banned Confederate insignias from the workplace, even to banning their display on employee vehicles using the plant parking lot. Defendant also conducted an investigation of the retirement gathering about which plaintiff complained. This kind of response by an employer can hardly be said to indicate indifference to employee complaints of harassment.

The fact that plaintiff is snubbed or given the cold shoulder by co-workers and union members does not mean defendant has permitted a hostile work environment. Not all harassing conduct is a violation of Title VII. *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir.2000). The standards for judging hostility under Title VII are demanding to ensure that it does not become a "general civility code." *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283–84. *See Raymond v. U.S. Capitol Police Bd.*, 157 F.Supp.2d 50 (D.D.C.2001) ("co-worker ostracism does not constitute an adverse employment action").

Plaintiff also contends that defendant's bulletins about harassment are insufficient, and he is critical of defendant for not using cameras for surveillance of his work area after the sardine oil incident.[8] The oil and watermelon sucker incidents have not been solved. However, this does not mean that the defendants response was inadequate. The issue is not whether plaintiff finds the response by defendant satisfactory but whether defendant's response was appropriate. "[A] plaintiff will not prevail simply because the remedy offered by defendant was not what plaintiff wanted." *Anderson*, 75 F.Supp.2d at 796. What is required is a good faith remedial action. *See Id.; Blankenship*, 123 F.3d at 873–74. Even if hindsight shows that more effective measures could have been undertaken, if the measures were appropriate at the time, they will meet the good faith standard. *Id.; Blankenship*, 123 F.3d at 874.

Employers and Title VII cannot change every employee's individual biases or bigotry.

> It may not always be within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.

*Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 350 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989) (quoting *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir.1980)). Defendant has done this by taking prompt and reasonable action to remedy bigotry in its workplace and by making and clearly stating and enforcing its zero tolerance policy for racial harassment and other inappropriate conduct. Plaintiff has not presented

---

**8.** Defendant looked into the use of cameras to perform surveillance on plaintiff's work area but did not use them because they could be seen.

evidence sufficient to raise an issue of whether defendant's responses to his complaints of harassment were appropriate. Defendant has met the good faith standard required of it in a co-worker harassment case, and therefore it cannot be held liable for discrimination or harassment.

## C. *Retaliation*

Plaintiff also contends that he was retaliated against when he was assigned to a second shift and when he was not appointed to a Lead position and not paid as a Lead.[9] In order to demonstrate a *prima facie* case of Title VII retaliation, plaintiff must show that:

(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000) (citations omitted); *see also Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir.2001). The first two elements are present.

■ With regard to the third element, Plaintiff testified in deposition that his supervisors did not act inappropriately toward him, so there is no showing of harassment by any supervisor. Thus, plaintiff has to identify a materially adverse change in the terms and conditions of his employment to demonstrate the third element of his *prima facie* case.

A material adverse change includes a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*White v. Burlington Northern & Santa Fe Railway Co.*, 310 F.3d 443, 450 (6th Cir. 2002). Plaintiff's claim that he was moved to the second shift does not meet this requirement. In his opinion, the second shift is a less desirable shift. However, there is no indication that plaintiff suffered a demotion or pay cut while on the second shift and in fact testified that employees on the second shift receive a premium. Plaintiff was on the second shift from January 2000 to February 2001. When he was given the option to stay on second shift or return to the first, he chose to return to the first shift.

Plaintiff's assignment to the second shift was a lateral transfer within his same job classification with the same title, seniority and pay. It was not an adverse employment action. *Id.; see also Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995) (transferring female employee from swing shift to day shift not adverse employment action). An adverse employment action must be more than a mere inconvenience. *White*, 310 F.3d at 450. In addition, the transfer of plaintiff to the second shift was not an "ultimate employment decision" as required by Title VII. *Id.* at 452–53.

With regard to plaintiff's contention that he was retaliated against by not being

---

**9.** Plaintiff has made general allegations concerning denial of training and promotion. The training allegation is not included in his EEOC charge. Plaintiff has made no showing that he was denied any training, promotion or advancement other than the failure to make him a Lead which is dealt with in the court's discussion. His claim that he should have been hired on at a higher rated position is time barred as will be discussed below.

made a Lead or given Lead pay, the court will assume for the purposes of argument that this conduct is an adverse employment action and that the third element of the *prima facie* case has been shown. However, plaintiff cannot meet the fourth element for the *prima facie* case because he has not shown a causal connection between his protected activity and the adverse employment action.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir.1984)). He must present "evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Walborn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir.1998) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990)).

 The person whose job plaintiff was asked to learn was not a Lead and was not being paid the additional 35 cents per hour given to a Lead employee. Thus, there is no basis for plaintiff's contention that he was doing the work of a Lead employee without the title or additional pay. His area did not have the need for a Lead employee until the new supervisor, Mike Purcell, took on additional duties. The person who was assigned to the Lead position had superior qualifications and held the appointment for approximately one year. Since that time, there has not been the need for a Lead employee. Plaintiff has not presented any proof to call into doubt these facts. While he contends that defendant stopped using Lead employees because of his interest in the

assignment, plaintiff has not presented any supporting facts or details, and without such support his perception is only speculation as to defendant's motives and insufficient to overcome summary judgment. *See Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 941 (6th Cir.1987).

These circumstances do not raise an inference that the likely reason for not making plaintiff a Lead was his protected activity or that he would have been made a Lead if not for his protected activity. The court concludes that plaintiff has not demonstrated a *prima facie* case of retaliation under Title VII on the basis of his not being made a Lead employee.

Even assuming *arguendo* that plaintiff has shown a *prima facie* case of retaliation under Title VII, defendant has met its burden of production and articulated legitimate nondiscriminatory reasons for not making him a Lead when the need arose or paying him for Lead duties. *Morris*, 201 F.3d at 792–793. The burden thus shifts to plaintiff to show that defendant's proffered nondiscriminatory reasons are not the true reasons for defendant's decisions. *Id.* at 793. In other words, plaintiff must show that the proffered reasons are a pretext for discrimination. *Johnson v. University of Cincinnati*, 215 F.3d 561, 578–79 (6th Cir.2000).

In order to show pretext, plaintiff must do more than just impugn the legitimacy of the employer's asserted justification; "in addition, the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (quoting *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994)); *see also Pierce*, 40 F.3d at 804 (plaintiff must do more than impugn employer's asserted justification; "plaintiff must also adduce evidence of the employ-

er's discriminatory animus"). With regard to pretext, the Sixth Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 883 (6th Cir.1996) (citations omitted).

 Plaintiff has not made such a showing. As referenced above, the person whose job plaintiff was asked to learn was not a Lead and did not receive the additional pay a Lead employee receives. Plaintiff has also not shown that the person who received the Lead appointment in his area did not have experience and qualifications superior to his. The fact that in plaintiff's opinion he was qualified contrary to defendant's assessment of his qualifications is irrelevant. *Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987); *Shapira v. LMES,* 88 F.Supp.2d 813 (E.D.Tenn.1998), *aff'd* 201 F.3d 441, 1999 WL 1204591 (6th Cir.1999) (Table). Plaintiff has not raised a genuine issue of material fact regarding the legitimate nondiscriminatory reasons for not making him a Lead. Thus, even if plaintiff had shown a *prima facie* case of retaliation, summary judgment would still be appropriate.

In addition, with regard to the assignment of plaintiff to the second shift and the issue of pretext, even if plaintiff's transfer to the second shift were an adverse employment action and he had demonstrated a *prima facie* case of retaliation on that basis, defendant articulated legitimate, non-discriminatory reasons for the transfer. As a result of a reduction in force and two scheduled retirements, defendant lost seven machinists on the second shift. To compensate for the loss, twelve machinists from the third shift were moved to the second shift and two machinists from the first shift were moved to the second shift. The fact that plaintiff was the most senior employee assigned hardly creates a material question of fact whether the transfer was a pretext for discrimination. Plaintiff was one of fourteen employees whose shift was changed. Again, plaintiff has not presented evidence sufficient to raise an issue whether defendant's reasons for assigning him to the second shift were a pretext for discrimination.

Accordingly, defendant's motion will be granted, and this case will be dismissed. An order reflecting this opinion will be entered.